# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-DP-01527-SCT

*DERRICK DEMOND WALKER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/06/2003 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM WAYNE HOUSLEY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MELANIE KATHRYN DOTSON |
| | MARVIN L. WHITE, JR. |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 03/31/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     On October 17, 2001, Derrick Demond Walker was indicted for the capital murder[1] of Charles Richardson pursuant to Miss. Code Ann. § 97-3-19(2)(e) and for arson of Richardson's dwelling.

¶2.     The trial court granted Walker's motion for psychiatric examination and investigative funds on January 24, 2002.  On May 7, 2003, the trial court granted Walker's motion to have a second psychiatric examination performed.  Walker had been tested by the Mississippi State

---

[1] The underlying felony was robbery.

Hospital at Whitfield, which found that Walker was not "under the influence of any extreme mental or emotional disturbance" during the commission of the crimes. However, during a pre-trial hearing Walker's counsel noted that Walker had refused to cooperate with them, including a refusal to even talk with counsel. Walker wanted to fire counsel and asked the trial court to release him so he could get his "own bought lawyer." Walker's counsel urged the court that this was evidence of mental instability. Since a question regarding Walker's mental condition had been raised, the court approved funds for additional psychiatric testing, which was administered by Dr. Mark Webb, a psychiatrist at Duke University.

¶3. On May 29, 2003, the trial court conducted a hearing on Walker's motion to suppress his statements, which were made separately to Arkansas and Mississippi law enforcement officers. Walker also claimed that when he was stopped for speeding in Arkansas, no probable cause existed to allow the officer, Mike Kennedy,[2] to physically inspect the vehicle or question him. Questioning by Arkansas police officers led to the first of Walker's confessions. Walker also claimed that he "may have been" under the influence of marijuana and "was or may have been" under the influence of stress at the time of the statements, and that either of these influences "would make any statements involuntarily and not knowingly given in an intelligent manner." The State claimed that Walker was lawfully stopped for speeding. The State claimed Walker had no basis to object to the search of the vehicle because the

---

[2] Officer Kennedy is a trooper with the Arkansas State Police.

vehicle did not belong to Walker, i.e., Walker did not have "standing."[3]  The State further argued that the stop, search and questioning were legal.

¶4.    While Kennedy was issuing a citation to Walker for speeding, Kennedy instructed Walker to sit in the passenger side of the front seat of his patrol car, while Kennedy ran a check on Walker's driver's license and car tag.  In response, Kennedy learned Walker's driver's license had been suspended, and according to Kennedy, Walker's statements at the scene had aroused suspicion regarding vehicle ownership.    Walker was arrested for driving with a suspended license,[4] and immediately received *Miranda* warnings and was patted-down for weapons.   Pursuant to a lawful inventory search of the vehicle after Walker's arrest and Kennedy's check of the license plate, Kennedy determined that the vehicle was registered to the brother of the victim.   Following Walker's arrest, Kennedy learned that Richardson had been murdered that morning.   Walker, already under arrest for driving with a suspended license[5] was now a suspect for possible involvement in Richardson's murder.    At that time, he was taken to an Arkansas State Police station, and was more thoroughly searched.

---

[3] Initially, Walker told Kennedy that the vehicle he was driving did not belong to him.

[4] Driving with a suspended license is an arrestable offense in Arkansas.

[5] Pursuant to Arkansas law, as Walker was the only occupant in the vehicle, Kennedy had no choice but to arrest Walker for driving with a suspended license. In cases where there is a licensed passenger to drive in lieu of the suspended driver, the officer is permitted by Arkansas law to allow that passenger to take control of the vehicle.  However, in situations–such as Walker's- where there is no one to assume control of the vehicle, Kennedy was bound by law to assume control of the vehicle and place Walker under arrest. Kennedy could not allow anyone driving with a suspended license to continue driving once the offense was discovered.

¶5.     Arkansas State Police Special Agent Dale Arnold was called in to interview Walker. After Walker was given *Miranda* warnings again, he stated that he understood the warnings and wanted to waive his rights. According to Arnold, Walker was sober and rational at the time he waived his *Miranda* rights. According to Arnold, Walker subsequently gave his statement freely and voluntarily, without threat or promise or hope of reward. In his statement, Walker confessed to murdering Richardson. Arnold reviewed the statement with Walker, and Walker was given an opportunity to read the statement. After reviewing the statement, Walker signed the statement, and handwrote, "I was read the above statement." To ensure propriety, the interview was videotaped.

¶6.     Walker was then taken to the St. Francis County Jail in Forrest City, Arkansas. Upon "booking" Walker and "dressing him out," Arnold noted injuries on Walker's body. When the injuries were pointed out by Arnold to Walker, Walker stated that he received the injuries during his struggle with Richardson. The injuries were photographed and documented by the Arkansas police.

¶7.     Kennedy and Arnold both testified that there was nothing about Walker's appearance or demeanor that led them to believe Walker was under the influence of stress, drugs or alcohol. According to Kennedy's testimony, Walker displayed no signs of sleep deprivation and Walker "appeared normal." Arnold testified that Walker's answers "were quick and responsive" during the questioning and while he was being given his *Miranda* warnings.

¶8.     David West, who is also employed with the Arkansas State Police, was present during the interrogation. He also testified that no threats or promises or hopes of reward were made to Walker. West testified that Walker acted normal, did not appear drunk or tired, and never

4

fell asleep during the interview; West further testified that Walker expressed an understanding of the questions asked of him, was not confused, never acted inappropriately, and was alert.

¶9.    Following Walker's statements to the Arkansas State Police, Jerry Davis and James King[6] questioned Walker at the St. Francis County jail. For the third time, Walker was read *Miranda* warnings, and he responded that he understood them. According to the testimony of Davis and King, Walker appeared alert and normal, and Walker agreed to waive his *Miranda* rights freely and voluntarily, without any threats or promises or hopes of reward. According to King, Walker volunteered information and answered questions without any difficulty; further, King stated that Walker was calm and relaxed throughout the questioning and did not look upset.

¶10.    The trial court, after hearing the evidence, found:

> The Court finds first of all beyond a reasonable doubt that the statements of the Defendant, which are the subject matter of this Motion to Suppress, were given by the Defendant after the Defendant had been properly, adequately and timely advised of his constitutional rights or so-called [*Miranda]* warnings by law enforcement officers and after the defendant had freely, voluntarily, knowingly, intelligently and understandingly waived his privilege against self incrimination. Furthermore, the Court finds beyond a reasonable doubt that each of the statements given by the defendant to law enforcement officers was [sic] given by the defendant knowingly, understandingly, intelligently, freely and voluntarily.
> Finally, the Court finds beyond a reasonable doubt that there is no evidence that either of the defendant's statements given to law enforcement officers was given by him as a result of any threat, coercion, inducement or promise. Therefore, the defendant's motion to suppress as to the statements given by the defendant to law enforcement authorities shall be and is hereby overruled.

---

[6] Both Davis and King are employed by the City of Tupelo, Mississippi Police Department.

¶11. On May 29, 2003, the Court conducted a pre-trial hearing on Walker's motion for a change of venue. Walker asserted that Richardson was a "quasi celebrity" and very popular in the Tupelo community, and when combined with the media coverage associated with the trial, that he would be denied a fair trial in Lee County, Mississippi. Walker asserted that "a large number of people in [the] community have already reached the conclusion that [he] is guilty." Walker submitted two videotapes from local television stations that had reported Richardson's murder. Walker also claimed, although never offered into evidence, that he had affidavits from two individuals who lived in the community stating that there had been extensive media coverage in the community, that Richardson was well-known in the community and that a large number of people in the community had already reached a conclusion regarding Walker's guilt.

¶12. In rebuttal, the State introduced live witness testimony from the Lee County Chancery Clerk, Tax Collector, Tax Assessor, and District 2 Supervisor, respectively; these individuals claimed that the case had not been a topic of interest in the community, and there had been no community feeling of malice, grudge or ill will by the community as a whole toward Walker.

¶13. Bobby Smith, the District 2 Supervisor of Lee County, testified that he often comes into contact with the citizens of Lee County, and there was no feeling of malice, grudge or ill will by the community as a whole toward Walker, and there was no a general community opinion that Walker was guilty of the crime charged.

¶14. Leroy E. Belk, Jr., the Lee County Tax Collector, who stated that it is important to mingle with the citizens of Lee County, testified that he did not have any conversations about Walker with any citizens of Lee County. Further, Belk testified that he had not observed in the community any evidence of malice, grudge or ill will toward Walker.

¶15.   Mark Weathers, the Lee County Tax Assessor, also testified that he had not heard any talk of malice, grudge or ill will toward Walker, and that he had not heard any talk of predisposition regarding Walker's guilt.   Weathers also testified that he attended part of Richardson's funeral.   Weathers disputed Walker's allegation concerning the large number of mourners in attendance.   According to Weathers's testimony, there were   only fifteen or twenty people in attendance.

¶16.   Bill Benson, the Lee County Chancery Clerk, testified that he had heard of no malice, hatred or ill will in the community toward Walker, and that he was of the opinion that Walker could receive a fair trial in Lee County.

¶17.   In regard to the television reports on the murder of Richardson, the State noted that the most recent report had been broadcast more than a year earlier.   Subsequently, the trial court determined that Walker had not satisfied his burden of proving the necessity for a change of venue and denied Walker's motion for a change of venue.

¶18.   The trial began on June 2, 2003.   On June 5, 2003, the jury found Walker guilty of capital murder and arson.   Following his conviction, Walker was sentenced to a term of twenty years for the arson.[7]   With respect to the capital murder conviction, a sentencing hearing was conducted,[8] and the jury returned the death sentence.

> We, the jury, unanimously find from the evidence beyond a reasonable doubt
> that the following facts existed at the time of the commission of the capital
> murder:
> 1. That the defendant actually killed Charles Richardson.
> 2. That the defendant attempted to kill Charles Richardson.

---

[7] This sentence was to run consecutive with the capital murder sentence.

[8] The sentencing hearing was conducted on June 6, 2003.

7

3. That the defendant contemplated that lethal force would be employed.

We, the jury, unanimously find that the aggravating circumstances of:
1. The capital offense was committed while the defendant was engaged or was an accomplice in the commission of flight after committing, attempting to commit any robbery, rape, arson, or burglary.
2. The capital offense was especially heinous, atrocious, and cruel exists [sic] beyond a reasonable doubt and are sufficient to impose the death penalty and that there are insufficient circumstances to outweigh the aggravating circumstances and we further find unanimously that the defendant should suffer death.

/s/ David Howe
Foreperson of the Jury

¶19. The trial court entered an order sentencing Walker to death by lethal injection on June 6, 2003. On June 16, 2003, Walker filed a motion for judgment of acquittal J.N.O.V. or, alternatively, for a new trial, which the trial court denied on June 30, 2003. Walker has now appealed to this Court and raises the following issues, which have been restated for clarification:

I. Whether Walker was deprived of effective assistance of counsel, due process and a fair trial by the trial judge's denial of Walker's request for recess of voir dire.

II. Whether voir dire of prospective jurors regarding their ability to impose the death sentence was adequate to reveal their bias in favor of the death penalty.

III. Whether there existed sufficient evidence to convict Walker on the charge of capital murder.

IV. Whether the trial court erred in failing to suppress statements and items discovered.

V. Whether the trial court erred in allowing the contents of buckets into evidence over the objection of Walker.

VI. Whether the trial court erred in denying Walker's motion for directed verdict, both at the close of the State's case and the entire case, and in denying Walker's motion for a new trial.

8

VII.  Whether the trial court erred in admitting unnecessary and gruesome autopsy photographs into evidence.

VIII.  Whether the trial court erred in giving a flight instruction.

IX.  Whether the trial court erred in failing to grant a requested instruction on the issue of confessions.

X.  Whether the trial court erred in failing to grant requested jury instructions on Walker's theory of the case and the lesser-included offense.

XI.  Whether the prosecutor's comments amount to misconduct.

XII.  Whether the trial court erred in instructing the jury that passion and sympathy have no part in sentencing.

XIII.  Whether this Court must remand for a new sentencing hearing in light of the sentencing instructions given to the jury.

XIV.  Whether the cumulative errors require reversal.

¶20.  Finding no merit, singularly or collectively, in any of the issues Walker raises, we affirm the judgment of the Lee County Circuit Court.

**FACTS**

¶21.  On July 17, 2001, Richardson was murdered in his home in Lee County, Mississippi.

¶22.  A week prior to the death of Richardson, Walker "crossed a guy."  Walker claims he did not know the man's name.  Walker said the man approached him and told Walker, "that [he] had to kill Charles Richardson or he would kill [his] mother and stepfather."  Walker knew Richardson because the men shared a familial connection–Walker's stepfather and Richardson were brothers-in-law.

¶23.  Walker stated, "I knew what I had to do."  On July 16, 2001, Walker began preparations to kill Richardson.  Walker took his television set, his laundry bag full of clothes and his

9

backpack and set them outside the bedroom window of his house, which was only one house down from Richardson's home. As stated by Walker: "My plan was to kill Charles Richardson, take his car, load my things into it and go to Chicago."

¶24. On the evening of July 16, 2001, Richardson attended a musical concert with the Lane Chapel Church quartet. Richardson had been assisting with youth activities throughout the day, and the festivities climaxed that night with the musical concert. Between 10:30 and 11:00 p.m. Richardson bid farewell to Patsy Holbrook, the pastor's wife, and left the concert to have a late dinner/early breakfast with family members. According to Holbrook, Richardson left the church festivities driving his dark blue Oldsmobile, which had "JB RICH" on the license plate.

¶25. At approximately 11:30 p.m. on July 16, 2001, Walker stated that he broke into Richardson's home by pushing in and crawling through a bathroom window. Armed with a six-inch hunting knife, Walker "waited for Charles to come home." At approximately 12:45 a.m., July 17, 2001, Walker heard Richardson come through the door. The remainder of the story is most effectively told in Walker's own words:

> I heard him lay his car keys on the table. When Charles walked down the hall[,] I jumped out of the bathroom and stabbed him in the lower abdomen with the knife. It was dark in the house[–]only the kitchen light, the light over the sink and a little night light on in the back. Charles stepped back into the kitchen and grabbed his stomach and said, "Who's that["?] Charles then came at me swinging. I started swinging with the knife. I stabbed Charles about four times. We fought in the hallway for about seven and a half minutes. Charles pushed me back and I tripped and he fell on me. Charles picked up a little round fan and hit me in my chest with it. Charles was still on top of me and just fell backwards. Charles was gasping for air. He just lay there about five more minutes before he [quit] gasping.
>
> I got up and wiped the blood off me with a towel. I took off my shorts and Chicago shirt and threw them on top of Charles. I got some of Charles['] clothes and put them on. I went to the little room where the lawnmowers were

10

and found a jug of gas. I poured the gas on the bed in one room, then some by the room where Charles was laying and then in the laundry room. I called the guy that had me do this[,] but his mother said it was too late to talk. I did this from Charles['s] phone. The fire just [started] on [its] own in the utility room before I could light it. I [panicked] and got the car keys off the table and went outside. I got my stuff out of the garbage can and loaded it into Charles['s] car. I got in the car and left headed for Chicago. I threw the knife out on the side of the road but[,] I don't remember where.

I drove to Arkansas. I stopped at a store on [Highway] 40 East. I don't remember if I used Charles['s] credit card there or not. I did not take the credit card from Charles[;] I found it in his car. I used the card at the Fastlane on Eason [Boulevard] in Tupelo. I missed the [Highway] 55 exit because it was raining. I rode a little while longer. I met an Arkansas State Police and he pulled me over. He said I was speeding. He arrested me for no driver's license or suspended license. I had made up a lie at first about where I got the car. I finally decided to tell them the truth about what had happened.

I knew what I was doing was wrong[,] but I was worried about my family. I really didn't have anything against [Charles. He] seemed like a nice fellow. He was my stepfather's brother-in-law.

*I. Pathology Report.*

¶26. An autopsy was performed on Richardson's body. The pathologist testified that he found fourteen stab wounds, with most penetrating approximately four inches deep. The pathologist also testified that Richardson was slashed eleven times. He determined that Richardson suffered two injuries, either of which could have been fatal–one to the neck and another to the abdomen.

¶27. He testified that Richardson received stab and/or slash wounds to his head, neck, face, temple, ear, nose, cheeks, arms, chest, scalp, hand, abdomen, back, chin and lip. Richardson received three stab wounds and seven slash wounds to his head, with the slashes averaging four to five inches in length. Richardson was stabbed four times in his face. The pathologist opined

11

that Richardson also suffered a defensive wound to the left hand by placing his hand between the knife and his body.

¶28.    He also testified to the rather obvious, it would be highly painful to receive these types of stab and slash injuries.   He stated: "It would be painful, and it would be excessive in infliction of the pain."

¶29.    Although Walker confessed to disposing of the knife he used to kill Richardson, he drew a picture of the knife for the police.   The pathologist agreed that Richardson's wounds were consistent with being caused by this type of weapon when he stated: "Certainly a sharp-edged weapon such as this could produce the injuries that I saw."   The knife Walker used was of such size that it could cause injuries larger and deeper than the ones inflicted on Richardson. However, he noted that there were no knife guard contusions on Richardson's body, which indicates that the knife used was not fully driven into Richardson's body.   He agreed that a bigger knife–like the one Walker stated was the murder weapon–could have been used to inflict the injuries to Richardson.

¶30.    The pathologist ruled the cause of Richardson's death to be homicide, resulting from a stab wound to his neck, with an additional cause of death resulting from a stab wound to the abdomen.

¶31.    Richardson's corpse also incurred postmortem insult as a result of the fire Walker started to destroy the evidence of the murder.   Although the fire itself did not contact Richardson's body, reflective heat caused insult.   According to the pathologist, Richardson had postmortem burns on his left flank, back and left forearm caused from reflective heat ranging between three and four hundred degrees.

*II. Arson.*

¶32. Tupelo Fire Department officials confirmed part of Walker's version as to how the fire started. James Cunningham of the Tupelo Fire Department stated that the fire appeared to have been started in the laundry room. Captain Thomas Walker of the Tupelo Fire Department, and expert witness for the State, was in charge of investigating the cause and origin of the fire at Richardson's home. Following an inspection of the scene, Captain Walker confirmed that the fire started in the laundry room. However, Captain Walker stated the fire did not start from any electrical components in the laundry room. Captain Walker's testimony at trial was that, "[The fire] started somewhere on the area of the floor in front of the dryer where there are no possible sources of ignition."

¶33. Captain Walker determined the cause of the fire to be arson. He found evidence of a "pour pattern" in the laundry room. According to Captain Walker, where flammable liquid is poured onto a surface, the area where the liquid settles "will not burn." Although the vapors from the liquid will burn, the area where the liquid is poured will be protected by the liquid as the vapors burn away. He stated that this "pour pattern" which was not found in any part of the house other than the utility room, is typical of what is found in an arson fire.

¶34. Captain Walker noted possible sources of ignitable fluid, including the presence of gasoline in a lawnmower and gas can in the utility room. This comports with Walker's confession that he used gas from the lawnmower can.

¶35. In Captain Walker's expert opinion, the nature of the fire was arson. Captain Walker testified that, "What I believe happened is that someone poured an ignitable liquid in this room on the clothes and flooring that were found in here, and the vapors from this fuel made its way

13

to the pilot light on the hot water heater and ignited." He further testified that the fire started because someone poured flammable liquid on the floor and the water heater caught the flammable liquid on fire. Again, this confirms Walker's statement that the fire started before he had a chance to light it.

### III. The Arrest.

¶36. Officer Kennedy verified Walker's statements about his arrest. On July 17, 2001, Kennedy was running stationary radar on Interstate 40. According to Kennedy's testimony, Walker was driving out of a construction zone behind the wheel of a blue Oldsmobile at an excessive rate of speed in violation of the posted speed limit. Kennedy pulled out of the median and chased the vehicle driven by Walker down. He initiated a traffic stop. After stopping Walker, Kennedy asked Walker for his driver's license. Walker stated that his license was in the trunk of his car; therefore, Kennedy allowed Walker to exit the vehicle in order to obtain his license. During Walker's retrieval of his license, Kennedy inquired as to the owner of the vehicle to which Walker replied that the car belonged to Richardson.

¶37. After retrieving his license from the trunk, Kennedy had Walker sit in the right front passenger seat of his patrol car, while Kennedy proceeded to issue a citation to Walker for speeding. While doing so, Kennedy ran a check on Walker's driver's license, which Officer Kennedy determined to be suspended. Arkansas law requires an inventory of any vehicle that is being taken into custody after its driver has been arrested. At that point, Kennedy again asked Walker to whom the car belonged. When asked this question, Walker changed his story informing Kennedy that he had recently purchased the automobile in Little Rock, Arkansas, for $500 from a man named Byron. Kennedy felt that this story was untrue and because: (1)

14

Walker had previously told him that the car belonged to Richardson; (2) the car appeared to be worth more than $500; (3) Walker had no bill of sale or receipt for the car; and (4) the car had Mississippi license plates even though Walker told him that the car was recently purchased in Little Rock, Arkansas.

¶38.    At that point, Kennedy arrested Walker for driving with a suspended license[9] and read him his *Miranda* warnings.  Kennedy then ran a check on the license plate of the car and discovered that it was registered to a Jeffrey Richardson.  Suspecting that the car may have been stolen, Kennedy attempted unsuccessfully to contact Jeffrey Richardson.  Arkansas law requires an inventory search of any vehicle that is being taken into custody after its driver has been arrested.  This procedure is to keep the driver/owner of the car from having the car returned to him/her and subsequently claiming that the police stole items from inside the car.  Kennedy then began an inventory search, and began looking for a clue as to the true owner since Walker changed his story about the ownership of the vehicle.

¶39.    During the inventory search of the vehicle, Kennedy discovered a program and some financial records from the Lane Chapel Church in Tupelo, Mississippi, that ultimately tied the car to Richardson.  Kennedy then attempted to contact Charles Holbrook, Sr., who was listed on the program as being the pastor of the Lane Chapel Church.  Pastor Holbrook's wife, Patsy Holbrook, was at home and took Kennedy's phone call.  After speaking with Pasty Holbrook, Kennedy discovered that Charles Richardson, the man whom Walker initially admitted owned the vehicle, had been murdered that very same day.

---

[9] As previously mentioned, driving with a suspended license is an arrestable offense in Arkansas.

*IV. Police Stations.*

¶40.    Walker was taken to the Arkansas State Police Headquarters in Forrest City, Arkansas, where police officers more thoroughly searched Walker's person, a standard operating procedure for anyone placed under arrest.   During a search of Walker, police found a credit card belonging to Richardson and a receipt from a gas station in Palestine, Arkansas.   The gas purchase was charged to Richardson's credit card and took place at 6:16 a.m. the day of Richardson's murder, and was only one hour and twenty minutes prior to Walker's arrest. Officers also observed several injuries to Walker's body and what appeared to be bloodstains on his clothing.   Officer Arnold then secured a search warrant for a more detailed and complete search of the vehicle.     Officers found bloody money, one book of matches, four keys, a cellular telephone and what appeared to be bloodstained clothing and tennis shoes in the trunk, including a bloody t-shirt bearing the logo of the Lane Chapel Church.

¶41.    Walker was then given *Miranda* warnings for the second time.   Walker was questioned by Arnold at which time he confessed to murdering Richardson.   Arnold testified that no threat or promise was given in order to obtain Walker's statement.   Walker stated that he went to Richardson house and stabbed him.   Furthermore, Walker stated that he stabbed Richardson at approximately 12:45 a.m. on the morning of July 17, 2001.   According to Arnold, Walker stated that after he murdered Richardson he "poured gas over the place," but the gas caught on fire by itself.   When Walker was taken to the county jail in Forrest City, Arkansas, he gave an additional statement regarding the injuries to his body.   Walker's statements that he was injured while struggling with Richardson again linked Walker to Richardson's murder.

¶42. Subsequently, Walker gave a third statement to the officers of the Tupelo Police Department. In all three statements, Walker consistently admitted to murdering Richardson.

**DISCUSSION**

¶43. The standard for this Court's review of an appeal from a capital murder conviction and death sentence is abundantly clear. Convictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny." *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992) (citing *Smith v. State*, 499 So. 2d 750, 756 (Miss. 1986)). This Court has explained the application of its "heightened scrutiny":

> These principles have long manifested themselves in varying particulars. We consider trial errors for the cumulative impact. We apply our plain error rule with less stringency. We relax enforcement of our contemporaneous objection rule. We resolve serious doubts in favor of the accused . . . as procedural niceties give way to the search for substantial justice, all because death undeniably is different.

*Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991) (internal citations omitted).

¶44. Under this method of review, all genuine doubts are to be resolved in favor of the accused because "'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" *Id.* (quoting *Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1978)). *See also Fisher v. State*, 481 So. 2d 203, 211 (Miss. 1985).

¶45. The State argues that many of Walker's assignments of error[10] are procedurally barred. Although Walker does not concede his failure to object, he responds by arguing that they are

---

[10] Issues I-V, XI, XII, and XIV.

subject to the plain error doctrine,[11] which is implicated when an error occurs at trial which affects substantial rights and results in "a manifest miscarriage of justice." **Gray v. State**, 549 So. 2d 1316, 1321 (Miss. 1989).

### I. Denial of Walker's Request for Recess of Voir Dire.

### II. Trial Court's Voir Dire of Prospective Jurors.

¶46. In his first issue, Walker alleges that the trial court erred in refusing to grant a recess during voir dire to allow the defense to begin its questioning on the following day. As a result, Walker asserts that he was denied his right to effective assistance of counsel, due process and a fair trial. Walker alleges that the full day of voir dire, starting at 8:30 a.m. and ending around 6:00 p.m., warranted such continuance. Walker claims that due to the trial court's refusal to allow a recess, he was denied a reasonable opportunity to inquire into the prejudices, preconceptions and ideas the venire had about the death penalty, especially in this case, where Walker claims Richardson's murder was "well publicized" and that "the victim was well-liked and well-known among the community and was a quasi-celebrity" in the Tupelo area. According to Walker, the denial of the continuance/recess prevented Walker from conducting voir dire adequately enough to secure a fair and impartial jury.

---

[11] The plain error doctrine arises from Mississippi Rule of Evidence 103(2)(d), which states: "Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." *See also* **Porter v. State**, 732 So. 2d 899, 902-05 (Miss. 1999) (violations of fundamental rights are also subject to plain error review); **Grubb v. State**, 584 So. 2d 786, 789 (Miss. 1991) (plain error will allow an appellate court to address an issue not raised at trial if the record shows that error did occur and the substantive rights of the accused were violated).

¶47. In his second issue, Walker claims the trial court failed to explore the issue of whether or not jurors would favor imposing the death penalty. Walker also claims the trial court refused to allow the defense to voir dire the prospective jurors on that issue. According to Walker, these actions, along with a denial of a recess, violated his right to adequately determine the "prejudices and biases of potential jurors regarding the punishment of death." Walker states: "The court refused to permit [Walker] to adequately voir dire by virtue of [the] prosecutor's sustained objections and prodding to 'move on.'"

¶48. As Issues I and II are interrelated, they shall be addressed in concert.

¶49. The State argues that Walker failed to object to the these issues and, therefore, is procedurally barred. Failure to raise an issue at trial bars consideration on an appellate level. *See* **Smith v. State**, 729 So. 2d 1191, 1201 (Miss. 1998) ("A trial judge will not be found in error on a matter not presented to him for decision."); **Williams v. State**, 684 So. 2d 1179, 1203 (Miss. 1996) (contemporaneous objection rule is applicable in death penalty cases); **Foster v. State**, 639 So. 2d 1263, 1270 (Miss. 1994) ("If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case."); *but see* **Grubb**, 584 So. 2d at 789 (plain error will allow an appellate court to address an issue not raised at trial if the record shows that error did occur and the substantive rights of the accused were violated).

¶50. Walker failed to make a timely objection regarding the recess and the possible prejudice or biases during the voir dire process; further, Walker failed to object at all to these

issues during the trial or sentencing phase. Walker's counsel, Wayne Housley,[12] claims that his failure to object was because "[he] felt that he must not seem overly aggressive toward the bench because strategy was such that credibility of counsel addressing voir dire would also take the lion's share of the sentencing phase." However, we find that Walker is procedurally barred from raising these issues for the first time on appeal.

¶51. Notwithstanding the procedural bar for failing to make a contemporaneous objection, these issues are without merit as Walker has offered no proof that his substantive rights were violated.

¶52. Walker has presented no evidence from the record to show that he did not have a fair and impartial jury. In fact, Walker does not even claim the jury possessed such characteristics as to prejudice his right to a fair trial. Importantly, following Walker's voir dire, his attorney announced on the record, "Your Honor, the defense is satisfied for cause."

¶53. Trial courts enjoy broad discretion in passing upon the extent and propriety of questions posed to prospective jurors. *Davis v. State*, 684 So. 2d 643, 651-52 (Miss. 1996). The court must conduct its own voir dire on the issue of death qualifications to determine whether the juror could follow the law and return a verdict of guilty even though such a verdict could result in the imposition of death. *Crawford v. State*, 716 So. 2d 1028, 1042 (Miss. 1998). The court must nevertheless exercise caution in its voir dire, so as not to suggest that there is only one proper answer to the death qualification questions. *Bell v. State*, 725 So. 2d 836, 844-45 (Miss. 1998).

---

[12] Housley was counsel for Walker during trial and is counsel for Walker on appeal.

¶54.    On June 2, 2003, the venire panels (both regular and special) met at 8:30 a.m.  The court qualified the jury prior to lunch, questioning the venire about age, voting registration, possible felony convictions, bootlegging, gambling, illnesses, lack of child care, job-related excuses, past jury duty, etc.    During the court's initial qualification, it briefly touched on the subject matter of jurors who were not able to render a verdict on another human being, i.e., jurors who, because of religious or moral reasons, cannot reach a verdict after hearing all of the evidence and being instructed on the law.    Although the court was not yet conducting voir dire on the death penalty issue, one juror did inform the court that she could not impose the death penalty.  In light of that juror's statement that she could not impose the death penalty, an opportunity for other like-minded jurors to voice their concerns arose, but no other juror spoke up.

¶55.    The court continued questioning until 11:50 a.m. and then took a ten minute recess until noon.   Both panels were seated according to the clerk's direction, and at approximately 12:30 p.m., the court recessed for lunch, with instructions that the jurors were to return at 2:00 p.m.  The court began voir dire of both panels around 2:00 p.m.    During the court's voir dire, personal convictions and legal duties regarding the death penalty were discussed in detail, with the court fully exploring the issue.  The following dialogue ensued during voir dire:

> BY THE COURT: The Court is going to use some terms in questioning you further that by their nature require that you understand their meaning as intended and understood by the Court.   Therefore, let me explain their meaning as the Court wants you to consider them in responding to the questions of the Court directed to you.   Death penalty means that as a punishment imposed by statute as a consequence of the conviction of the commission of an offense the person convicted is put to death in the manner and at the time prescribed by law.   A conscientious scruple is an objection or repugnance growing out of the fact that a person believes that the thing demanded of him or her to be morally wrong, his or her conscience being the sole guide to his or her decision, as opposed to a decision dictated by reason or judgment.   It is necessary whether the Court know

21

whether or not, as a matter of law, you have any conscientious scruples against the imposition of the death penalty. The Court must know whether or not you so strongly favor the death penalty that you would automatically vote to impose it in the event an accused was found guilty of capital murder. Also, the Court must know whether or not your feelings toward the death penalty would prevent you from serving as a completely fair and impartial juror as to the guilt or innocence of the accused.

* * *

Do either of you have any religious convictions or conscientious scruples that would prevent you from imposing the death penalty when the law authorizes it and the facts and evidence warrants it? I ask you that question on the special venire.

The court asked if any prospective jurors had religious convictions or conscientious scruples that would _prevent_ them from imposing the death penalty on a human being. Thereafter, seventeen members of the venire came forward to state that they could not impose the death penalty. The court then individually asked these jurors whether they would be able to impose the death penalty under any circumstances; all seventeen said that they could not.

¶56. The court not only inquired as to which jurors opposed to the death penalty, but also asked if anyone on the panels so strongly _favored_ the death penalty that in the event Walker was found guilty of capital murder, that juror would automatically vote to impose death regardless of the facts or evidence. The court stated:

BY THE COURT: Do any of you so strongly favor the death penalty that, in the event the defendant is found guilty of capital murder, that you would automatically vote for the death penalty regardless of the evidence you might hear or receive in reference to whether or not the death penalty should be imposed? I ask that question to the persons on the special venire.

No one from the special venire responded in the affirmative. The Court then asked the same question of the regular panel. Not one juror from the regular panel responded in the affirmative.

¶57. Following these questions to both panels, the court asked whether any juror had such feelings about the death penalty that they would be prevented from making a fair and impartial decision on the question of guilt or innocence of Walker.

> BY THE COURT: Do any of you have such feelings about the death penalty that you would be prevented from making a fair and impartial decision on the question of the guilt or innocence of the defendant? I ask that question to the special venire.

The court then asked the same question to the regular panel. This was another opportunity for any panel member to express reservation. An additional person on the regular panel responded to the court's question stating that she opposed death under any circumstances.

¶58. The court again asked the question regarding whether any juror had any feelings that would prevent them from being fair and impartial on the question of Walker's guilt or innocence.

> BY THE COURT: Since we have had a response, I will ask this question again, now that you have had some time to think about it. Do any of you have such feelings about the death penalty that you would be prevented from making a fair and impartial decision on the question of the guilt or innocence of the defendant? Other than Mr. McGraw. Anyone else?

No one responded in the affirmative to the court's question. The court concluded its voir dire at 3:44 p.m.

¶59. Walker has presented no evidence that any potential juror withheld death penalty favorable preferences.

23

¶60. The trial court properly and throughly questioned the venire on the dual issues of opposition to and preference towards the death penalty. Consequently, this issue is without merit.

¶61. Upon concluding its voir dire, the court gave the venire a fifteen minute recess. At approximately 4:00 p.m., the State began its voir dire, which concluded around 5:00 p.m. Following the conclusion of the State's voir dire, Walker moved for a recess until the next morning, citing the "late hour and the need to do a very thorough voir dire." The court overruled Walker's motion for a recess. Although Walker's counsel made no formal objection, the following dialogue ensued:

> BY MR. HOUSLEY: Your Honor, as the Court is well aware of this, this is a death penalty case. A little disruption, a little inconvenience to the panel is, although unfortunate, it is necessary to ensure that a fair trial is received, Your Honor.

> BY MR. GEDDIE: Your Honor, --

> BY THE COURT: I have heard enough. The motion to recess and reconvene in the morning for the defendant's voir dire is overruled. You may proceed.

¶62. Walker began his voir dire at approximately 5:00 p.m. A review of the record does not reveal exactly what time Walker concluded his voir dire; however, following Walker's voir dire, the court spoke to the jury about being sequestering. The jury was released at 6:05 p.m. until the following morning. Walker's voir dire lasted less than one hour. Following his voir dire, Walker did not state that he had additional questions for the jury. Walker did not mention the allegedly late hour at that point and most importantly did not renew his motion to recess for the day. Walker conducted his voir dire, and then announced on the record, *"Your Honor, the defense is satisfied for cause."* (Emphasis added).

24

¶63. Voir dire "'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" ***Ballenger v. State***, 667 So. 2d 1242, 1250 (Miss. 1995) (quoting ***Morgan v. Illinois***, 504 U.S. 719, 729, 112 S. Ct. 2222, 2230, 119 L. Ed. 2d 492 (1992)) (citations omitted). *See also* ***Simmons v. State***, 805 So.2d 452, 498 (Miss. 2001) ("Ordinarily, trial judges have broad discretion in determining how long trials last on any given day."); ***Dye v. State***, 498 So. 2d 343, 344 (Miss. 1986) (stating that trial judges are ordinarily given broad discretion in deciding when to begin or stop trials on any given day). Therefore, since there is no "bright line" rule as to when a trial judge should grant a continuance or recess, the peculiar facts of each case are the proper focal point of the analysis. ***Hooker v. State***, 716 So. 2d 1104, 1113 (Miss. 1998). This Court will not reverse the decision of the trial court on a failure to grant a continuance or recess where the defendant fails to show he was prejudiced by the trial court's denial of his request. ***Forbes v. State***, 437 So. 2d 59, 61 (Miss. 1983) (citing ***Howell v. State***, 246 So. 2d 95, 96 (Miss. 1971)).

¶64. Walker has not provided any proof to show prejudice resulting from the trial court's initial denial of his request for a recess until the next morning. Walker conducted less than one hour of voir dire, and at such conclusion, did not renew his request for a recess, but instead announced that he was satisfied with the jury. There can be no error in the court's decision not to recess to continue questioning the next day, when no request was made. We further find that the trial judge did not abuse his discretion in determining that voir dire would continue past 5:00 p.m.

¶65. In the case sub judice, neither party disputes that voir dire was a lengthy process. However, the jury was given ample time for lunch and breaks. Therefore, we hold that the trial

judge did not abuse his discretion in refusing, at 5:00 p.m., to allow an evening recess until the next morning. The trial judge never stated that Walker was required to conclude his voir dire only on that day; Walker was only required to *begin* voir dire that day. The fact remains that Walker's counsel concluded his voir dire in less than one hour and did not indicate that he was finishing solely because it was past 5:00 p.m. At the conclusion of his voir dire, Walker's counsel did not indicate that he had any more proposed questions for the jurors such that a renewed motion for a recess should be granted. Walker's counsel simply stated that he was "satisfied with the jury for cause."

¶66. Walker claims that he was denied the opportunity to adequately question the jurors during voir dire regarding death qualification because the State made constant objections, which were sustained by the court. The following dialogue ensued during Walker's voir dire:

> BY MR. HOUSLEY: You -- whichever 12 of you are chosen will be embarking on something I feel like you will never forget. You will be challenged to determine whether he will be given life or death. You will literally have --
>
> BY MR. GEDDIE: Your Honor, --
>
> Q. (Continuing by Mr. Housley): --Mr. Walker's --
>
> BY MR. GEDDIE: Your Honor, --
>
> Q. (Continuing by Mr. Housley): --life in your hands.
>
> BY MR. GEDDIE: Objection.
>
> BY THE COURT: Sustained.
>
> Q. (Continuing by Mr. Housley): I hesitate to even discuss the sentencing phase, because he sits there presumed innocent. But because of the very nature --
>
> BY MR. GEDDIE: Objection, Your Honor.

26

BY THE COURT: Mr. Housley, are you leading up to additional questions?

BY MR. HOUSLEY: Yes, Your Honor.

BY THE COURT: If you would, get -- move on to those questions.

¶67. The trial court was correct in sustaining the State's objections as Walker's counsel was not asking proper voir dire questions, but rather making speeches.

¶68. Walker's counsel's only other attempt to qualify the jury came in yet another speech in which he attempted to instruct the jury with a mercy charge during the middle of voir dire. The following ensued:

> BY MR. HOUSLEY: Do each of you understand that you are never -- that means never -- required to return a death penalty? Even -- even if the State proves capital murder and that there are sufficient aggravators, it is never required that any of you render a death penalty. Do you understand that? In other words, each and every one of you can hold on to your beliefs and your feelings and render your --
>
> BY MR. GEDDIE: Your Honor, --
>
> Q. (Continuing by Mr. Housley): -- own opinion.
>
> BY MR. GEDDIE: Objection. He is instructing the jury on the law. I'm not sure of the validity of the law he is instructing on, but it's the Court's duty to instruct the jury. It's the jury's duty to follow the law as the Court gives it to them, not as counsel says.
>
> BY THE COURT: The objection is sustained. Counsel and ladies and gentlemen of the jury, at the appropriate time the Court will instruct you fully and completely on the law as it applies in this particular case.

¶69. "[C]ounsel's statement concerning mercy was doubly incorrect, violating both the rule prohibiting attorneys from instructing the jury on the law, as well as the rule denying such instructions to the jury in the first place." *See **Goodin v. State***, 787 So. 2d 639, 645-48, 657-58 (Miss. 2001) (stating that counsel should not instruct the jury as to what the law is during

27

voir dire, and mercy instructions could induce a jury to base its decision on emotion, whim and caprice).

¶70. Additionally, we find that the trial court not only fully explored the issue of jurors predisposed in favor of or in opposition to the death penalty, but it also did not improperly hinder Walker's efforts to fully explore same. The court sustained three objections during Walker's voir dire. Two of the objections were validly based on the fact that Walker was not questioning the jury, but rather making speeches. The third objection was validly based on the fact that Walker was not only instructing the jury–a duty reserved to the court–but also that such an instruction was a mercy instruction–a charge not even the trial court can give. As such, despite the procedural bars on the two claims, Walker's first and second issues must fail otherwise.

¶71. Walker's argument that the court's actions caused trial counsel to be ineffective during voir dire must fail as Walker has shown no merit in the underlying issues presented. As such, there can be no prejudice, and thus, no ineffectiveness of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064-65, 80 L. Ed. 2d 674, 693-95 (1984) (requiring appellant to prove: (1) that his counsel's performance was deficient; and (2) that this alleged deficiency prejudiced his defense); *Stringer v. State*, 454 So. 2d 468, 476-77 (Miss. 1984) (where this Court adopted the standard set forth in *Strickland*). We find that voir dire was more than sufficient, and Walker's counsel as much as conceded this fact following his

questioning. Consequently, Walker's claim that the trial court's actions forced counsel to conduct an ineffective voir dire must necessarily be rejected.[13]

### III. Sufficiency of the Evidence.

¶72. Walker claims that the State failed to prove beyond a reasonable doubt that he formed the requisite intent to commit any felony act, specifically that of robbery, as outlined in Miss. Code Ann. § 97-3-79 (2000). According to Walker, there was no evidence to indicate he ever showed the requisite intent to rob Richardson, an element of capital murder that the State was charged with proving. Walker also makes a sufficiency of the evidence claim, noting the facts that there was no fingerprint or DNA testing conducted, and that the murder weapon used to kill Richardson was never discovered.

¶73. In regard to the "intent to rob" issue, the State submits that Walker's claim is not properly before this Court and is procedurally barred from our consideration for failure to cite any relevant authority. *See **Pulphus v. State***, 782 So. 2d 1220, 1224 (Miss. 2001) ("Issues cannot be decided based on assertions from the briefs alone. The issues must be supported and proved by the record."); ***Williams v. State***, 708 So. 2d 1358, 1362-63 (Miss. 1998) (failure to cite relevant authority obviates the appellate court's obligation to review such issues). A review of Walker's brief reveals that he has not cited any relevant authority to support his

---

[13] As previously mentioned, Housley represented Walker during trial and presently represents Walker on appeal. The fact that Housley has admitted alleged ineffectiveness at trial is irrelevant to this Court's determination of his effectiveness. Pursuant to the standard set forth in ***Strickland***, counsel's effectiveness is viewed under an "objective standard of reasonableness." *See **Hawthorne v. State***, 835 So. 2d 14, 21 (Miss. 2003).

argument. Therefore, Walker is procedurally barred, and we are not required to review this issue.

¶74. However, notwithstanding this procedural bar, and in light of the heightened standard of review, a thorough analysis of this issue will be conducted.

¶75. As we have stated many times, the standard of review for the legal sufficiency of the evidence is as follows:

> [W]e must, with respect to each element of the offense, consider all of the evidence--not just the evidence which supports the case for the prosecution--in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence.

*Sheffield v. State*, 749 So. 2d 123, 125 (Miss. 1999) (quoting *Gleeton v. State*, 716 So. 2d 1083, 1087 (Miss. 1998)).

¶76. Capital murder is defined in Miss. Code Ann. § 97-3-19 (2000 & Supp. 2004), which states in pertinent part:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery. . . .

¶77. Robbery is defined in Miss. Code Ann. § 97-3-79 as follows:

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery and, upon conviction, shall be imprisoned for life in the state penitentiary if the penalty is so fixed by the jury; and in cases where the jury fails to fix the penalty at imprisonment for life in the state penitentiary the court shall fix the penalty

at imprisonment in the state penitentiary for any term not less than three (3) years.

¶78. The elements of robbery are: "(1) felonious intent, (2) force or putting in fear as a means of effectuating the intent, and (3) by that means taking and carrying away the property of another from his person or in his presence." *Caldwell v. State*, 481 So. 2d 850, 853 (Miss. 1985).

¶79. Walker's "intent" claim must fail substantively for two reasons. First and foremost is the fact that Walker confessed that his intention was to rob Richardson. As stated by Walker:

> *My plan* was to kill Charles Richardson, *take his car*, load my things in it and go to Chicago.

(Emphasis added). This confession clearly evidences Walker's intent to rob Richardson.

¶80. Second, aside from Walker's confession of intent, the element of intent is clearly evidenced through the actions of Walker prior to Richardson's murder. Walker packed his belongings and hid them outside his house; by doing so, Walker would have easy access to retrieve them and place them in Richardson's car, to escape town following the murder of Richardson. Additionally, Walker confessed to taking Richardson's clothing and his car and

leaving the State of Mississippi. Finally, following the murder,[14] Walker was found with Richardson's car, Richardson's credit card and Richardson's clothes.

¶81. This Court has stated that the intent to rob, which is required to prove the underlying felony of robbery, can be shown from the facts surrounding the crime. *Lynch v. State*, 877 So. 2d 1254, 1266 (Miss. 2004) (collecting authorities).

¶82. In *Knox v. State*, 805 So. 2d 527 (Miss. 2002), Knox contended that the State presented insufficient evidence to prove that he intended to rob the victim when he killed her. Because of the alleged insufficiency of evidence, Knox argued that the State failed to prove the underlying felony of robbery, and, therefore, the charge of capital murder. *Id.* at 531. This Court disagreed with Knox's claims holding: "'Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case.'" *Id.* (quoting *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974)). This Court found it most significant that Knox was in possession of the victim's personal belongings at the time he was arrested. *Id.* at 532. This Court held: "[W]hen the defendant is discovered with the personal property

---

[14] The State points out that this Court has noted on numerous occasions that there is no need for the robbery to take place prior to the victim's death in order for the robbery to meet the statutory elements of Section 97-3-79. *See Turner v. State*, 732 So. 2d 937, 950 (Miss. 1999) (time of death of victim–be it before or after the victim's property was taken–is irrelevant); *West v. State*, 553 So. 2d 8, 13 (Miss. 1989) ("An indictment charging a killing occurring 'while engaged in the commission of' one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony.") ("The fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge."); *West v. State*, 463 So. 2d 1048, 1055-56 (Miss. 1985) ("If the intervening time between the time of the murder and the time of taking of the property formed a continuous chain of events, the fact that she was dead when he took the property could not absolve the defendant from the crime of robbery.").

of the deceased on his person it is entirely within reason for the jury to find that this fact in itself constitutes robbery." *Id.*

¶83.    Here, the State presented an abundance of evidence to support the robbery element of capital murder much more than this Court required in *Knox*.

¶84.    Even without DNA or fingerprint evidence, Walker's confession and the expert's testimony were sufficient for a reasonable jury to find Walker guilty of capital murder. Moreover, Walker's claim of insufficiency in failing to produce the murder weapon used to kill Richardson and other evidence is spurious.    Walker confessed to setting Richardson's house on fire to destroy any evidence and to throwing the murder weapon off a bridge during his flight from Richardson's home.    It is impossible for the State to produce what Walker has admittedly destroyed.

¶85.    Taking the evidence in the light most favorable to the State, it is clear that a reasonable, fairminded juror could find Walker guilty of capital murder, with the underlying felony of robbery, and arson, all beyond a reasonable doubt.    The evidence presented was sufficient to support a verdict of guilty.    Therefore, notwithstanding the procedural bar for failing to cite any relevant authority, Walker's claim is without merit.

### IV.  Walker's Statements and the Items Discovered.

¶86.    The State argues that Walker failed to object to the this issue.  Failure to raise an issue at trial bars consideration on an appellate level. *See Smith*, 729 So. 2d at 1201 ("A trial judge will not be found in error on a matter not presented to him for decision."); *Williams*, 684 So. 2d at 1203 (contemporaneous objection rule is applicable in death penalty cases); *Foster*, 639 So. 2d at 1270 ("If no contemporaneous objection is made, the error, if any, is waived.  This

33

rule's applicability is not diminished in a capital case."); *Cole v. State*, 525 So. 2d 365, 369 (Miss. 1987) ("Counsel may not sit idly by making no protest as objectionable evidence is admitted, and then raise the issue for the first time on appeal."); M.R.E. 103(1)(a) (requiring timely, on-the-record objection before error can be predicated on the admission of evidence). The rule that failure to object constitutes waiver applies to Fourth Amendment claims as well. *Stevens v. State*, 458 So. 2d 726, 730 (Miss. 1984).

¶87.    During a suppression hearing, the trial judge sits as a fact finder. *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996).   On appeal, the trial judge's findings can only be reversed for manifest error or if they are against the overwhelming weight of the evidence. *Id.*

¶88.    Walker claims that the trial court erred in admitting into evidence his statements and the items found in Richardson's car after he was stopped and arrested for driving with a suspended license.   Walker alleges that there was no evidence to support the initial stop because he was never issued a speeding ticket.   Walker claims that because there was no ticket "in any form or fashion," the reason for the stop "could easily" have been pretextual; thus, the fruit of the search incident to stop violated his Fourth Amendment right to be free from illegal search and seizure. *See Wong Sun v. United States*, 371 U.S. 471, 485-86, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963) (holding that a search and seizure which is illegal at its inception is not rendered legal by "what brings it to light").   However, Walker produced no proof to even suggest that the stop was pretextual.

¶89.    A review of the record reveals that the trial court conducted a thorough hearing on Walker's motion to suppress his statements and the items found in Richardson's car.   Both the statements and pictures of the items found were introduced as evidence at trial.   At no time at

trial did Walker claim that the stop itself was pretextual, thereby rendering inadmissible the statements and items discovered. Therefore, this assignment of error is procedurally barred from review by this Court.

¶90. In regard to the evidence seized from the Richardson car, alternatively, Walker is procedurally barred as well, in light of the fact that he has no standing to make a Fourth Amendment claim. *See generally* **Rakas v. Illinois**, 439 U.S. 128, 133-44, 99 S. Ct. 421, 425, 58 L. Ed. 2d 387 (1978). That amendment states:

> The right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (emphasis added). "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." **Alderman v. United States**, 394 U.S. 165, 174, 89 S. Ct. 961, 966, 22 L. Ed. 2d 176 (1969). Richardson, not Walker, was the owner of the car. Only persons whose Fourth Amendment rights have been violated can benefit from the protections of the exclusionary rule. Therefore, we hold that Walker has no standing to allege a Fourth Amendment claim.

¶91. Assuming arguendo that Walker is not procedurally barred, his argument is without merit. The proponent seeking to overturn a denial of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the confession or evidence in question were obtained in violation of his Fourth Amendment rights. *See* **Baldwin v. State**, 757 So. 2d 227, 231 (Miss. 2000). In **United States v. Escalante**, 239 F.3d 678, 680-81 (5th Cir. 2001), the court stated:

> The traffic stop may have been pretextual. But under ***Whren v. United States***, [517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)], a traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has "probable cause to believe that a traffic violation has occurred." *This is an objective test based on the facts known to the officer at the time of the stop, not on the motivations of the officer in making the stop*. On the other hand, if it is clear that what the police observed did not constitute a violation of the cited traffic law, there is no "objective basis" for the stop, and the stop is illegal.

(Footnotes omitted) (emphasis added).

¶92.    Officer Kennedy testified that Walker was speeding as he was exiting the construction zone. Walker never contested, and does not now contest, Kennedy's testimony that he was speeding. Because Walker failed to contradict Kennedy's testimony that he was speeding, the testimony of Kennedy shall be taken as true. *See **Hearin-Miller Transporters, Inc. v. Currie***, 248 So. 2d 451, 454 (Miss. 1971). Therefore, it cannot be said that Kennedy's stop was pretextual.

¶93.    Walker further claims that "pretext" is shown from the fact that he never was issued a speeding citation. Although this Court has never addressed the present issue, the Court of Appeals has stated: "There is no requirement that an officer issue a citation for the predicate traffic violation to have a valid stop or search." ***McCollins v. State***, 798 So. 2d 624, 628 (Miss. Ct. App. 2001). *See also **Allenbrand v. State***, 217 Ga. App. 609, 610, 458 S.E.2d 382, 383-84 (1995) (citing ***Hines v. State***, 214 Ga. App. 476, 477-78, 448 S.E.2d 226, 228 (1994)) ("Whether a citation is issued is 'of no consequence' in determining the officer's probable cause to stop the vehicle."). Walker's claim is without merit.

¶94.    We hold that Walker has no standing to allege a Fourth Amendment violation because he has no reasonable expectation of privacy in a car he stole and did not own. Further, Walker

never disputed that he was in fact speeding–a valid reason for the stop–immediately preceding him being pulled over by Kennedy. Walker has presented no evidence that Kennedy was without probable cause to stop him and no evidence to suggest that any failure to issue a ticket was the result of an alleged pretextual stop. The evidence before us shows that the stop was objectively valid and, thus, notwithstanding the procedural bars, this issue is devoid of merit.

### V. Contents of the Buckets and Testimony.

¶95. Walker argues that the trial court erred in allowing into evidence, during the testimony of the crime lab expert, Sharon Jones,[15] the evidence buckets and their contents, which were recovered at the scene of the crime. Walker claims that the proper foundation was not laid and that there were no witnesses that testified to the chain of custody of the buckets. Walker claims that the testimony of Jones, who was a witness allegedly not disclosed until the eve of trial. This Court is unable to find any evidence in the record supporting Walker's claim that Jones was not disclosed as a witness until the eve of trial and cannot find any objection by Walker in the record regarding allowing Jones to testify at trial. This Court has stated that it "must decide each case by the facts in the record, not assertions in the brief, however sincere counsel may be in those assertions. Facts asserted to exist must and ought to be definitely proved and placed before us by a record, certified by law; otherwise, we cannot know them." *Moawad v. State*, 531 So. 2d 632, 635 (Miss. 1988) (quoting *Mason v. State*, 440 So. 2d 318, 319 (Miss. 1983)). "In the absence of anything in the record appearing to the contrary, this Court presumes that the trial court acted properly." *Id.* at 635 (collecting authorities).

---

[15] Jones has been employed by the Mississippi State Crime Laboratory as a forensic scientist for over 22 years.

Therefore, this Court will not rely on assertions in Walker's brief unsupported by the certified record on appeal. Additionally, Walker claims that to allow Jones to testify regarding another's finding violates due process and the principles of fairness.

¶96. In regard to the "chain of custody" issue, the State argues that Walker failed to object at trial or at sentencing. Failure to raise an issue at trial bars consideration on an appellate level. *See Burns v. State*, 729 So. 2d 203, 219 (Miss. 1998) (citations omitted) (where this Court held that when a party makes an objection on specific grounds, it is considered a waiver regarding all other grounds); *Smith*, 729 So. 2d at 1201 ("A trial judge will not be found in error on a matter not presented to him for decision."); *Williams*, 684 So. 2d at 1203 (contemporaneous objection rule is applicable in death penalty cases); *Foster*, 639 So. 2d at 1270 ("If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case."). The record does not reveal an objection by Walker in regard to a "chain of custody" violation. Consequently, Walker is procedurally barred from raising this issue for the first time on appeal.

¶97. Alternatively, and without waiving any procedural bar for failing to object, this issue is without merit. The evidence buckets were two buckets found at the scene of the crime, in the utility room where the fire began, and these buckets were part of the physical evidence taken from the scene of the crime. Jones, during examination, confirmed that the buckets contained gasoline.

¶98. The admissibility of the buckets themselves, and their contents, is not an issue. Walker agreed to the admitting into evidence of the buckets and their contents during the testimony of Captain Walker, the State's fire expert witness, which was prior to the testimony of Jones.

38

Thus, any claim that the items themselves were improperly introduced is waived. The only issue for consideration here is the propriety of the crime lab expert's testimony regarding this evidence. Although Walker initially objected to the introduction of the buckets, noting that there might not be a witness from the Mississippi Crime Lab to testify as to the results, the State argued that the buckets should be admitted during Captain Walker's testimony so that Captain Walker could confirm the chain of custody–the State wanted the buckets admitted into evidence so that it could "tie up a chain of custody with this witness."

¶99. The trial court, with the understanding that Walker had reserved his right to object to any expert testimony regarding the contents of the buckets, then asked Walker if he had any objection to receiving both the buckets and their contents into evidence. Walker thereafter stated, "If that's all with this witness, I have no objection." Following the admission of the buckets into evidence, Captain Walker testified as to the chain of custody. Captain Walker testified that he personally took the buckets from the laundry room, and then took them to the Mississippi State Crime Laboratory in Jackson. According to Captain Walker's testimony, "Once the crime lab analyzed them, they were returned back to me, and they have been under my custody, under lock and key, and I brought them in here this morning." Furthermore, Captain Walker testified that he personally picked them up himself from the crime lab.

¶100. On cross-examination, Captain Walker was asked if he could state the source and origin of the fire without relying on the crime lab results. The following dialogue ensued:

> BY MR. BRISTOW: Without relying upon the crime results and their testing of Exhibits 42, 43 and 44, are you able to state that the source, the origin -- the origin of this fire was that in the utility room?

BY CAPTAIN WALKER: What I can do *without knowing the results* of this is tell you that the fire started in the utility room, and it did not start from any electrical components of that room, and it started somewhere on the area of the floor in front of the dryer where there was no possible source of ignition.

BY MR. BRISTOW: And your testimony is that the pour patterns lead you to suspect an incendiary agent or liquid; is that right?

BY CAPTAIN WALKER: The pour patterns led me to concentrate on gathering evidence to see if there was an ignitable liquid present.

(Emphasis added).

¶101. As previously mentioned, Jones testified subsequent to Captain Walker. Walker was then asked whether he wished to voir dire Jones as to her qualifications to which he responded, "No, Your Honor. The defense is satisfied." Thereafter, Jones was qualified as an "expert in the field of forensic science with a technical specialty in examination of fire debris for the purposes of determining flammable liquids within" by the trial court.

¶102. Jones testified that she had been qualified as an expert over fifty times in the field of forensic science examination and had been qualified as an expert in fire debris analysis. Jones further testified that she was "involved in assessing or actually technically reviewing and analytically reviewing" the testing that associate Lisa Futrell, who is also employed by the crime lab, did on the buckets. Jones further testified that such "peer review" is standard operating procedure in the crime lab:

BY MS. JONES: All analyses that are performed in the Mississippi Crime Laboratory have to be reviewed technically and analytically, and they are reviewed in a peer review situation. So, with Ms. Futrell being the analyst of record on this particular case, I was the peer reviewer, and *I made an independent analysis of the -- of the -- of the chromatograms that she had actually generated from the instrumentation, and they agreed with the same conclusions that she had.*

(Emphasis added). Thus, it is clear that Jones was testifying as to her own independent conclusions.

¶103. Jones testified that all evidence is received into the laboratory by an evidence technician from a law enforcement agency, and that evidence is assigned to whatever section is requested for an analysis. Jones also testified that the buckets were intact, having been sealed in the evidence container in which it was received, and having been labeled with both the crime lab case number and the initials of Futrell.

¶104. Jones confirmed that an independent analysis had been performed on each of the evidence buckets in order to determine the presence of flammable liquid substances inside each. Jones also stated that she performed a "peer review" of each of Futrell's analyses regarding the buckets, thereafter signing off on Futrell's analysis as correct. Jones testified: "I looked at [Futrell's] data that she had generated from the instrument and also made an independent conclusion myself, and in my conclusion agreed with her conclusion of it containing ignitable liquids."[16]

¶105. At this point, Walker objected reasoning that Jones did not personally observe the testing of the buckets; therefore, Walker claimed that Jones was precluded from testifying regarding the results because such would be hearsay. The trial court overruled Walker's objection. The record reveals that Jones made an independent analysis of each of Futrell's results, and was presenting her own conclusions to the jury. In allowing Jones's testimony, the court held:

---

[16] Jones later testified that gasoline was present in both of the buckets; in one of the buckets, a medium petroleum product such as mineral spirits, some paint thinners, or other solvents, was present.

BY THE COURT: The Court finds that this witness has satisfactorily explained the procedure followed at the Mississippi Crime Lab and that this procedure is used as a matter of routine, as I understand it, throughout the United States. She has also testified that the tests were preformed under her direction and control by Ms. Futrell, and the witness has verified the test results made by Ms. Futrell, and has signed off on the analysis done by Ms. Futrell after peer review of the test conducted by Ms. Futrell, where this witness has testified that she agreed with the results reached by Ms. Futrell and that she came up with the same results on her own. Therefore, the objection of the defense shall be overruled.

¶106. Walker's assignment of error is not meritorious for two reasons. First, the testimony regarding the contents of the buckets was properly admitted. Mississippi Rule of Evidence 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

*See also* ***Jones v. State***, 776 So. 2d 643, 650 (Miss. 2000) (holding that a pathologist was allowed to testify as to statements made by a forensic anthropologist confirming pathologist's findings). In ***Alexander v. State***, 759 So. 2d 411, 420 (Miss. 2000), this Court noted that the comment to Mississippi Rule of Evidence 703 "expressly states that an expert witness may use data that is presented to the expert 'outside of court and other than by his personal observation.'"

¶107. We hold that the trial judge did not err in allowing Jones to testify based upon the report of Futrell. Jones independently confirmed and approved this report. Jones was a qualified expert, who was accepted without objection by Walker, and Jones was testifying about items already admitted into evidence. Based on the Mississippi Crime Laboratory's standard operating procedure, Jones regularly relies on information initially procured by associate

42

employees. Therefore, the trial court was correct in ruling that Jones's testimony was not hearsay.

¶108. It can hardly be said that the testimony regarding the contents of the buckets is reversible error in light of the overwhelming evidence in favor of admission of the evidence. *See Ellis v. State*, 667 So. 2d 599, 605 (Miss. 1995) (quoting *Ray v. State*, 503 So. 2d 222, 224 (Miss. 1986)) (emphasis in original) (stating that this Court's review should disturb the findings of the lower court **"only where there is an absence** of substantial credible evidence supporting it."). Walker confessed on three separate occasions that he set the house on fire. Furthermore, Walker confessed to taking gasoline from a nearby lawnmower can in the laundry room and pouring the gasoline from the can on the floor, which ignited.

¶109. The following facts are undisputed: (1) a fire actually occurred; (2) the cause of the fire was arson; (3) a pour pattern was found on the floor of the utility room; (4) there was a gasoline can at the scene; and (5) the buckets and their contents were already in evidence prior to the testimony of Jones. Therefore, the only thing Jones's testimony adds to the mix is that the buckets also contained evidence of gasoline. The jury still had as evidence Walker's statements, a gas can at the scene, and Captain Walker's testimony that the cause of the fire was arson.

¶110. "Reversible error may be found only where a substantial right of a party is affected and the party claiming error raised an objection or made an offer of proof at trial." *Lynch*, 877 So. 2d at 1281 (citing Miss. R. Evid. 103(a)). *See also Mitchell v. State*, 792 So. 2d 192, 217 (Miss. 2001); *Murphy v. State*, 453 So. 2d 1290, 1293-94 (Miss. 1984); *Brown v. State*, 338 So. 2d 1008, 1009-10 (Miss. 1976). "The admission of testimonial evidence is left to the

sound discretion of the trial court and it will be found in error only when it has abused that discretion." *Lynch*, 877 So. 2d at 1281 (citing *Harris v. State*, 731 So. 2d 1125, 1130 (Miss. 1999)).

¶111. In the case sub judice, Walker has not presented evidence proving that his rights were substantially affected. The jury had before it Walker's statements that he intended to burn the house. Walker has failed to prove that he was prejudiced by the testimony of Jones. Therefore, notwithstanding the procedural bar for failing to object to the "chain of custody" and Jones's testimony initially, Walker's assignment of error is devoid of merit.

### VI. Motion for Directed Verdict and New Trial.

¶112. Walker made a motion for directed verdict at the close of the State's case-in-chief and at the close of his case-in-chief. Following the verdict, Walker filed for a J.N.O.V. or, in the alternative, a new trial.

¶113. Walker claims that the trial court erred in not granting his motion for directed verdict and/or J.N.O.V. and motion for a new trial. Additionally, Walker claims that the State failed to present a prima facie case against him, and the insufficient evidence of his guilt warrants reversal.

¶114. The standard of review for a directed verdict and J.N.O.V. are the same. *Shelton v. State*, 853 So. 2d 1171, 1186 (Miss. 2003). A motion for a directed verdict or J.N.O.V. challenges the legal sufficiency of the evidence presented at trial, not the weight of the evidence. *Id.* "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court." *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). This occurred when the trial

court overruled Walker's motion for J.N.O.V. In asking for a judgment as a matter of law, Walker is asking this Court to hold that the verdict reached by the jury may not stand. *See Janssen Pharmaceutica, Inc. v. Bailey*, 878 So. 2d 31, 54 (Miss. 2004).

¶115. As we have previously discussed, there is no basis for concluding that the evidence against Walker was insufficient to support a conviction. *See supra* Issue III. However, because we find that Walker is not entitled to a judgment as a matter of law, we must utilize the standard of review for a motion for new trial.

> A motion for a new trial falls within a lower standard of review than does that of a judgment notwithstanding the verdict or a directed verdict. A motion for a new trial simply challenges the weight of the evidence. "The Supreme Court will reverse the lower court's denial of a motion for a new trial only if, by doing so, the court abused its discretion." [*Gleeton*, 716 So. 2d at 1088]. "We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983). Likewise, factual disputes are properly resolved by a jury and do not mandate a new trial. *McNeal v. State*, 617 So.2d 999, 1009 (Miss. 1993).

*Sheffield*, 749 So. 2d at 127. This Court held in *McFee v. State*, 511 So. 2d 130, 133 (Miss. 1987), that it has limited authority to interfere with a jury verdict. The court looks at all the evidence in the light that is most consistent with the jury verdict. *Id.*

¶116. We hold that the trial court did not abuse its discretion in denying Walker's motion for a new trial. As previously mentioned, Walker confessed to killing Richardson on three different occasions. In Walker's own words, he stabbed and slashed Richardson with a six-inch hunting knife until Richardson bled to death, he attempted to set Richardson's house on fire to destroy any remaining evidence and he stole Richardson's car and other possessions and fled in the direction of Chicago. Moreover, Walker's confessions were confirmed by expert

testimony. When Walker was arrested in Arkansas he was in possession of Richardson's car and personal belongings. Over a four-day trial, the jury heard testimony from ten witnesses–all presented evidence for the State. We are not "convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *See **Groseclose***, 440 So. 2d at 300. Consequently, Walker's assignment of error is without merit.

### VII. Photographs.

¶117. Walker claims that the autopsy photographs of the victim admitted into evidence and shown to the jury did not assist the jury in any regard, but instead were admitted solely for the purpose of inflaming the passions of the jury. For this reason, Walker claims that the trial court erred in admitting the photographs. Further, Walker claims that the number of photographs served to horrify the jury.

¶118. The exclusion of relevant evidence is governed by Mississippi Rule of Evidence 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"The determination as to whether photographs are admissible rests within the sound discretion of the trial judge whose decision will be upheld absent a showing of abuse of discretion." ***Lanier v. State***, 533 So. 2d 473, 483-84 (Miss. 1988) (citations omitted). "*Some* 'probative value' is the only requirement needed to buttress a trial judge's decision to allow photographs into evidence." ***Parker v. State***, 514 So. 2d 767, 771 (Miss. 1986) (emphasis added). "The

mere fact that photographs depict an unpleasant or gruesome scene is no bar to their admission if they are relevant." *Lanier*, 533 So. 2d at 484 (citing *Dase v. State*, 356 So. 2d 1179 (Miss. 1978)).

¶119. Photographs have evidentiary value in the following instances: "'(1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; and (3) supplement or clarify witness testimony.'" *Spann v. State*, 771 So. 2d 883, 895 (Miss. 2000) (quoting *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995) (citations omitted)). Photographs used to support testimony of witnesses have been accepted as relevant and their admission as evidence was not an abuse of discretion. *Lanier*, 533 So. 2d at 484.

¶120. In the case sub judice, Walker moved to suppress the autopsy photographs of the victim, which the State used to supplement the testimony of the pathologist, Dr. Steven T. Hayne. The photographs aided in describing the circumstances of the killing and the cause of death. Prior to him testifying, the trial court conducted a hearing outside the presence of the jury on Walker's motion regarding the autopsy photographs admissibility. During this suppression hearing, Walker argued that the photographs were cumulative of each other, and the autopsy report was less prejudicial than the autopsy photographs.

¶121. Following the voir dire of the pathologist by both parties, in order to determine the need for and relevance of the photographs,[17] the trial court overruled Walker's objection, stating:

---

[17] The State took each of the photographs, which were numbered Exhibits 1-12 and 55, and reviewed them with the pathologist. The pathologist admitted that three photographs (3, 9, 11) were cumulative of other evidence presented in other photographs. Therefore, the State withdrew these photographs, which were not shown to the jury.

> The Court finds that these photographs are relevant and they will assist in explaining, supplementing and clarifying the testimony of [the pathologist], and the probative value of these photographs is not outweighed by their danger of unfair prejudice; and further finds that these photographs are not cumulative, the State having withdrawn three of the photographs that might in some way be redundant or cumulative. For those reasons, the objection of the defendant to these photographs shall be and is hereby overruled.

¶122. The pathologist testified that the remaining photographs were relevant to show the identity of Richardson, the type of injuries inflicted upon Richardson and the manner of Richardson's death.

¶123. It is evident that these photographs were used to corroborate and aid the testimony of the expert. They were not overly gruesome, prejudicial or inflammatory. The pictures accurately depicted the nature of Richardson's injuries and were probative to showing how he was murdered. We conclude that Walker was not unfairly prejudiced by the admission of the autopsy photographs, and the trial court did not abuse its discretion in admitting them into evidence.

### VIII. Flight Instruction.

¶124. In determining whether error exists in granting or refusing jury instructions, the instructions must be read as a whole; if the instructions fairly announce the law and create no injustice, no reversible error will be found. *Collins v. State*, 691 So. 2d 918, 922 (Miss. 1997).

¶125. In regard to flight instructions, this Court has held that "flight is a circumstance from which an inference of guilt may be drawn and considered along with all the other facts and circumstances connected with the case." *Hubbard v. State*, 187 So. 2d 885, 886 (Miss. 1966). "'[A]n instruction that flight may be considered as a circumstance of guilt or guilty

knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge.'" *Reynolds v. State*, 658 So. 2d 852, 856 (Miss. 1995) (quoting *Fuselier v. State*, 468 So. 2d 45, 57 (Miss. 1985)). This Court has further explained that in determining whether a flight instruction is appropriate, two considerations are paramount:

(1) Only unexplained flight merits a flight instruction.
(2) Flight instructions are to be given only in cases where that circumstance has considerable probative value.

*Banks v. State*, 631 So. 2d 748, 751 (Miss. 1994) (quoting *Pannell v. State*, 455 So. 2d 785, 788 (Miss. 1984)). However, the evidence of flight is inadmissible if "there is an independent reason for flight known by the court which cannot be explained to the jury because of its prejudicial effect upon the defendant." *Fuselier*, 702 So. 2d at 390. Additionally, the probative value must substantially outweigh its prejudicial effect. *Mack v. State*, 650 So. 2d 1289, 1309 (Miss. 1994).

¶126. Walker claims that the trial court erred in giving a flight instruction, which included the following allegedly unnecessary and potentially confusing language: "and in the absence of a reasonable explanation therefor." According to Walker, this language spoke to his failure to testify and incorrectly emphasized his need to explain absenting himself from the crime scene. Moreover, Walker claims that the flight instruction was unwarranted because his flight was explained and was not probative of his guilt or guilty knowledge. The instruction given, C-11, stated:

The Court instructs the Jury that flight, in the absence of a reasonable explanation therefor, is a circumstance from which guilty knowledge and fear may be inferred. If you find from the evidence in this case, beyond a reasonable doubt, that the defendant, DERRICK DEMOND WALKER, did flee from the scene of the death of Charles R. Richardson, and that there was no reasonable

49

explanation therefor, then you may consider that flight in connection with all other evidence in this case. You will determine from all of the facts whether the flight was from a conscious sense of guilt or *whether it was caused by other things*, and give it such weight as you think it is entitled to in determining the guilt or innocence of DERRICK DEMOND WALKER.

(Emphasis added).

¶127. We do not agree with Walker's claim that the giving of a flight instruction is an improper comment on his right not to testify. *See Randolph v. State*, 852 So. 2d 547, 564 (Miss. 2002) ("flight is a circumstance from which an inference of guilt may be drawn and considered along with all the other facts and circumstances connected with the case").

¶128. Walker's flight was predetermined according to his statement that his "plan was to kill Charles Richardson, [steal] his car . . . and go to Chicago."

¶129. Here, Walker's reason for flight may be "explained" by virtue of his confession. However, there is sufficient direct evidence of Walker's guilt apart from any inference regarding his flight, because he confessed to killing Richardson and fleeing in Richardson's vehicle. Therefore, any claimed error that may have occurred in granting the flight instruction does not rise to the level of reversible error and is harmless beyond a reasonable doubt. *See Kolberg v. State*, 829 So. 2d 29, 49 (Miss. 2002) ("[e]ven where error has occurred, we will not reverse a conviction when the overwhelming weight of the evidence supports the guilty verdict").

¶130. This Court is not prepared to condemn flight instructions. We caution trial courts to only allow such instructions in the rarest of cases.

¶131. Walker has failed to demonstrate to this Court any prejudice he suffered as a result of the trial court giving a flight instruction. We conclude that the trial court did not err in giving

50

the flight instruction, but assuming arguendo error was present, it would be harmless error beyond a reasonable doubt. *See generally* **Mack**, 650 So. 2d at 1310; **Randolph**, 852 So. 2d at 566.

### IX. Proposed Jury Instructions D-12 and D-14.

¶132. This Court's standard of reviewing the denial of jury instructions is well settled.

> The Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole. **Thomas v. State**, 818 So. 2d 335, 349 (Miss. 2002). A defendant is entitled to have jury instructions which present his theory of the case. **Id.** This entitlement is limited, however, in that the court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. **Id.**

**Parks v. State**, 884 So. 2d 738, 746 (Miss. 2004). Furthermore, "[a] trial judge is under no obligation to grant redundant instructions." **Ellis v. State**, 790 So. 2d 813, 815 (Miss. 2001) (citing **Bell**, 725 So. 2d at 849). The refusal to grant a jury instruction that is similar to one already given does not constitute reversible error. **Laney v. State**, 486 So. 2d 1242, 1246 (Miss. 1986).

¶133. Walker argues that the trial court erred in not granting jury instructions D-12 and D-14. Proposed jury instruction D-12 states:

> The Court instructs the Jury that if you believe from the evidence in this case that the alleged confession or statement of the Accused was untrue, you should disregard it; or if you believe from the evidence that it was made under the influence of hope or fear, you may take this into account in determining what weight or credit, if any, you decide to attach to it as evidence.

Proposed jury instruction D-14 states:

> The Court instructs the Jury that evidence has been presented that the Accused acted under duress in committing the crime.

Duress is the exercise of unlawful force upon a person whereby he is compelled to do some act that he otherwise would not have done. In order for duress to be a defense to a criminal charge, the impelling danger must be present, imminent and impending and of such a nature as to induce in that person a well-grounded apprehension of death or serious bodily harm if the act is not done. A person having a reasonable opportunity to avoid committing the crime without undue exposure to death or serious bodily harm cannot invoke duress as a defense.

If the State has failed to prove the evidence in this case, beyond a reasonable doubt, that the Accused acted voluntarily in committing the crime and was not under duress, then you shall find the Accused NOT GUILTY.

¶134. During the objections to the proposed jury instructions, the State argued that D-12 was throughly covered in the trial court's instruction[18] to the jury that they are the sole judge's of fact, and they must give what weight and credibility to the evidence as it deserves. The State further argued that there was no evidence to support D-12 because each of the witnesses who took the stand testified that he was calm, relaxed, and factual, and was not promised anything or given any hope of reward and was not threatened to get his statement. Walker offered no proof to support the granting of D-12, and the trial judge correctly refused D-12.

¶135. In regard to proposed jury instruction D-14, there was no evidence to support the instruction because Walker offered nothing more than an allegation in his statements that he "crossed a guy," without name or description, and this unidentified "guy" forced him to kill Richardson by a threat to kill his parents, some weeks before. No testimony or proof was

---

[18] Jury instruction C-1, which was given, states in pertinent part: "You are the sole judges of the facts in this case. Your exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who testified in this case."

offered that the alleged threat of impelling danger was present, imminent, and impending, or that Walker did not have a reasonable opportunity to avoid committing the crime.

¶136. Walker claims he requested the instructions to keep the jury from "from making the decision in a vacuum." Walker cited *Thomas v. State*, 426 So. 2d 795 (Miss. 1983), for the proposition that the proposed instructions supported the evidence. However, we find *Thomas* to be distinguishable. In *Thomas*, the defendant testified at trial, and the jury was *never* given the general instruction from the court that they were the sole judges of the weight and credibility of the evidence and witnesses. *Id.* at 795. Consequently, in *Thomas*, this Court found that the failure to give the general instruction necessitated the giving of the defendant's requested instruction regarding his confession. *Id.* Here, the jury was given the general instruction by the court.

¶137. In regard to the duress Walker alleges to have been under, he could not provide the identity or offer any description of the "guy." During testimony, Officer Davis stated: "We tried to get into it a little deeper, tried to get him to identify this person, but he couldn't -- he couldn't produce anything on that." All other parts of Walker's statement were corroborated at trial except for the part of his statement that he "crossed a guy" and was under duress. Assuming arguendo that this "guy" actually threatened Walker, Walker provided no evidence that there was any imminent danger to him if he did not kill Richardson, such that Walker would have a "well-grounded apprehension of death or serious bodily harm." Walker also contradicts himself. Initially, in his statement to the police, Walker stated that he did not know who the "guy" was that threatened to kill his relatives. Later in the statement, Walker stated: "I called the guy that had me do this[,] but his mother said it was too late to talk." Although

53

Walker claims that he does not know the "guy," he has his phone number and spoke with his mother. Walker did not reveal the phone number to law enforcement to investigate his claims.

¶138. If the defendant presents sufficient evidence in the record to support his theory of the case, he should then be given an instruction on his theory of the case. There needs not be even a plausible explanation. Whether he has met this standard is a matter of law and not a matter of fact for the jury to decide, unless he has presented sufficient evidence in the record to support same. Walker has not meet this standard to be given such an instruction. Therefore, the trial court did not err in refusing the instruction.

¶139. We find that Walker has presented no evidence to support his claim that either of his proposed instructions should have been granted. We find that proposed jury instruction D-12 was redundant, and proposed jury instruction D-14 was properly denied for a lack of evidence presented to support duress.

### X. Proposed Jury Instruction D-15.

¶140. This Court has stated:

> [T]he jury should not be instructed as to a lesser-included offense in such a way as to ignore the primary charge as this would be confusing to the jury. It is also true that if the evidence does not justify submission of a lesser- included offense, the court should refuse to do so. Unwarranted submission of a lesser offense is an invitation to the jury to disregard the law.

*Presley v. State*, 321 So. 2d 309, 310 (Miss. 1975); *see also Grace v. State*, 375 So. 2d 419, 420 (Miss. 1979). Furthermore, "'[l]esser-included offense instructions should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense. . . .'" *Hobson*

54

*v. State*, 730 So. 2d 20, 26 (Miss. 1998) (quoting **Welch v. State**, 566 So. 2d 680, 684 (Miss. 1990)); *see also* **Colburn v. State**, 431 So. 2d 1111, 1114 (Miss. 1983) (holding that jury instructions should not be given unless there is an evidentiary basis in the record for such). A lesser-included offense instruction should be granted "[i]f a 'rational' or a reasonable jury could find [Walker] *not guilty* of the principal offense charged in the indictment yet *guilty* of the lesser-included offense." **Davis**, 684 So. 2d at 656-57 (quoting **Monroe v. State**, 515 So. 2d 860, 863 (Miss. 1987)) (emphasis added).

¶141. In **Ruffin v. State**, 444 So. 2d 839, 840 (Miss. 1984), this Court expressly declared that, only where the evidence could *only* justify a conviction of the principal charge should a lesser-included offense instruction be refused. *See also* **Fairchild**, 459 So. 2d at 801. Therefore, evidence must be presented at trial to support the trial court granting a lesser-included instruction on murder. *See* **Edwards v. State**, 737 So. 2d 275, 310-11 (Miss. 1999); **Turner**, 732 So. 2d at 948-50; **Bell**, 725 So. 2d at 854 (Miss. 1998); **Evans v. State**, 725 So. 2d 613, 664-66 (Miss. 1997). In order for a lesser-included offense instruction to be granted, the trial judge must be able to say, taking the evidence in the light most favorable to the accused, that a reasonable jury could find the defendant guilty of the lesser-included offense (and conversely not guilty of at least one element of the principal charge). **Harper v. State**, 478 So. 2d 1017, 1021 (Miss. 1985). Said another way, only if this Court can say, taking the evidence in the light most favorable to Walker, and considering all reasonable favorable inferences which may be drawn in favor of Walker from the evidence, and considering that the jury may not be required to believe any evidence offered by the State, that

55

no hypothetical, reasonable jury could convict Walker of simple murder, can it be said that the refusal of the lesser-included offense instruction was proper. *See **Ruffin***, 444 So. 2d at 840.

¶142. Walker makes a general claim that the evidence supported a lesser-included jury instruction without providing any specific facts or evidence in the record to support such a statement.

¶143. Proposed jury instruction D-15 states:

> The court instructs the jury that if you find that the State of Mississippi has failed to prove any or more of the essential elements of capital murder involving Charles Richardson beyond a reasonable doubt, then it is your duty to find the defendant not guilty of capital murder of Charles Richardson. If you find the defendant not guilty of the capital murder of Charles Richardson, you may continue your deliberations to determine whether or not the defendant is guilty of murder.
>
> If you find from the evidence beyond a reasonable doubt that:
>
> 1. On or about the 17th day of July, 2001 in Lee County, Mississippi;
>
> 2. The defendant, Derrick Demond Walker did kill Charles Richardson, a human being, without authority of law by any means or in any manner;
>
> 3. By deliberate design to effect the death of Charles Richardson;
>
> then it is your sworn duty to find the defendant guilty of murder.
>
> Should the State of Mississippi fail to prove any one or more of the essential elements of murder beyond a reasonable doubt then you shall find the defendant not guilty of murder.

¶144. Walker does not actually state why he is entitled to this lesser-included offense instruction. Walker failed to state his theory of the case, or how that theory is covered by D-15, which only instructs the jury on simple murder. There is no evidence presented to support Walker's vague claim, and therefore, Walker's claim must fail. Aside from the murder itself,

all the State was required to prove in order to make out a prima facie case for capital murder was that Walker committed the murder while engaged in the underlying felony of robbery.

¶145. The sufficiency of the robbery evidence was thoroughly discussed in Issues III and VI, *supra*. Walker confessed on separate occasions to planning on robbing Richardson, and Walker also confessed to actually robbing Richardson. Walker was also found in possession of numerous personal belongings of Richardson. There is ample evidence to prove robbery, and there is no evidence to support a theory of simple murder when the underlying felony to that murder is glaringly obvious. We find that a rational, fair-minded juror could find Walker guilty of capital murder, and following **Davis** and **Monroe**, the lesser-included offense instruction was properly denied.

## XI. Prosecutor's Comments at the Sentencing Phase.

¶146. The State argues that Walker is procedurally barred from raising some subsections (all except the subsection regarding the safety of the prison guards) of this issue for the first time on appeal for failure to contemporaneously object and raise the issue at trial.

¶147. Although Walker concedes that no contemporaneous objection was made during the sentencing phase, he relies on **Faraga v. State**, 514 So. 2d 295, 303 (Miss. 1987), for the proposition that, "Although no objection was raised during the argument, under this Court's heightened level of scrutiny for death penalty cases, they will be reviewed." *See also* **Hansen**, 592 So. 2d at 142 (relaxing the contemporaneous objection rule and applying the "plain error" rule); **Grubb**, 584 So. 2d at 789 (plain error will allow an appellate court to address an issue not raised at trial if the record shows that error did occur and the substantive rights of the accused were violated).

¶148. In *Williams v. State*, 512 So. 2d 666 (Miss. 1987), defense counsel did not object to prosecutor's closing argument, and this Court held that "[t]he failure of an objection is fatal." *Id.* at 672 (citing *Johnson v. State*, 477 So. 2d 196 (Miss. 1985)). This Court has held that "[i]f no contemporaneous objection is made, the error, if any, is waived." *Walker*, 671 So. 2d at 597 (citing *Foster*, 639 So. 2d at 1270). The contemporaneous objection rule is in place to enable the trial court to correct an error with proper instructions to the jury whenever possible. *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986) (citing *Baker v. State*, 327 So. 2d 288, 292-93 (Miss. 1976)). To preserve an issue for appeal, a contemporaneous objection must be made. *Ratliff v. State*, 313 So. 2d 386 (Miss. 1975). *See also* *Box v. State*, 610 So. 2d 1148 (Miss. 1992) (defendant failed to contemporaneously object to the prosecutor's remarks during closing argument, and a motion for mistrial, made after jury verdict of guilty, was deemed too late); *Monk v. State*, 532 So. 2d 592, 600 (Miss. 1988) (contemporaneous objection during closing argument must be made, otherwise it is waived); *Gray*, 487 So. 2d at 1312 (contemporaneous objection during prosecution's closing argument must be made or it is deemed waived); *Coleman v. State*, 378 So. 2d 640, 649 (Miss. 1979) (defendant failed to object to a statement by the district attorney in closing argument and a motion for mistrial after the jury had retired was deemed too late).

¶149. "'[I]t is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court.'" *Evans*, 725 So. 2d at 670 (quoting *Johnson v. State*, 477 So. 2d 196, 209-10 (Miss. 1985)). This Court on numerous occasions has refused to consider the issue of prosecutorial

misconduct where the defendant did not raise it at trial, and we so refuse to do so today. *See*, *e.g.*, ***Dufour v. State***, 483 So. 2d 307, 311 (Miss. 1985); ***Billiot v. State***, 478 So. 2d 1043, 1045 (Miss. 1985); ***In re Hill***, 460 So. 2d 792, 799 (Miss. 1984); ***Smith v. State***, 434 So. 2d 212, 216 (Miss. 1983); ***Read v. State***, 430 So. 2d 832, 836 (Miss. 1983). We find that all subsections of this issue except for the subsection regarding the safety of the prison guards is procedurally barred because Walker failed to contemporaneously object at trial.

¶150. Alternatively considering the claimed errors on their merit, Walker's claim as a whole likewise fails. Walker claims that the State committed reversible error in arguing during closing arguments at the sentencing phase matters that were not in evidence, including that Walker was a member of a gang and smoked "a ton of marijuana." Walker also claims that the State committed reversible error when it improperly compared Richardson's lack of rights to Walker's abundance of rights. Additionally, Walker argues that the State committed reversible error when the it made improper references to the description of Richardson's murder as being torturous (suggesting heinous, atrocious or cruel, when no such instruction was given), and finally that the safety of the prison guards was at issue if Walker was to receive a life sentence.

¶151. Walker relies on ***Hunter v. State***, 684 So. 2d 625, 639 (Miss. 1996) (Sullivan, P.J., concurring in part & dissenting in part), where Presiding Justice Sullivan stated:

> Hunter was entitled to be punished only on the evidence before the jury at that time and only on the evidence relevant to his circumstances. A jury can impose the death penalty only if the evidence relating to those charges convinces them of the defendant's guilt beyond a reasonable doubt, not to fix societal problems.

Walker further relies on ***Taylor v. State***, 672 So. 2d 1246 (Miss. 1996), where this Court stated: "The aggravating circumstance [of heinous, atrocious or cruel] may be used only when

59

the jury is instructed as to its meaning in a manner which will channel the jury's discretion in sentencing." *Id.* at 1276. Finally, Walker relies on *Willie v. State*, 585 So. 2d 660, 681 (Miss. 1991), *overruled on other grounds*, *King v. State*, 784 So. 2d 884 (Miss. 2001), for the proposition that, "When life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind underlying felony as separate aggravators." Thus, Walker claims that the improper comments alluding to the aggravators that remained allegedly undefined, violated Walker's right to a fair trial. The State asserts Walker's claim is spurious.

¶152. "'[T]he very purpose of an advocate is to help the jury draw conclusions from the evidence and to make suggestions as to a proper conclusion.'" *Evans*, 725 So. 2d at 671 (quoting *Blue v. State*, 674 So. 2d 1184, 1208 (Miss. 1996)). Furthermore, the prosecutor is entitled to argue inferences based upon evidence presented at trial, and it is appropriate for the prosecutor to draw inferences without stating his personal opinion. *Id.*

> Statements made by the prosecution must also be considered in light of this Court's observation that "counsel should be given wide latitude in their arguments to a jury[. . . .] Courts should be very careful in limiting the free play of ideas, imagery and the personalities of counsel in their argument to a jury." *Johnson v. State*, 477 So. 2d 196, 209 (Miss. 1985). However, counsel is clearly limited to arguing facts introduced in evidence, deductions and conclusions he or she may reasonably draw therefrom, and the application of the law to the facts. *Ivy v. State*, 589 So. 2d 1263 (Miss. 1991).

*Taylor*, 672 So. 2d at 1266. A prosecutor should refrain from argument that distracts the jury from its duty to decide the case on the evidence by instilling issues broader than the guilt or innocence of the accused. *See Williams v. State*, 522 So. 2d 201, 209 (Miss. 1988).

¶153. In *Evans*, this Court stated:

60

The right to argument contemplates liberal freedom of speech and range of discussion confined only to bounds of logic and reason; and if counsel's argument is within limits of proper debate, it is immaterial whether it is sound or unsound or whether he employs wit, invective, and illustration therein. Moreover, figurative speech is legitimate if there is evidence on which it may be founded. Exaggerated statements and hasty observations are often made in the heat of the day, which, although not legitimate, are generally disregarded by the court, because in its opinion, they are harmless. There are, however, certain well established limits beyond which counsel is forbidden to go. He must confine himself to the facts introduced in evidence and to the fair and reasonable deduction and conclusions to be drawn therefrom and to the application of the law, as given by the court, to the facts.

Absent impermissible factors such as commenting on the failure of the defendant to testify, a prosecuting attorney is entitled to great latitude in closing argument. *Dunaway v. State*, 551 So. 2d 162, 163 (Miss. 1989).

725 So. 2d at 676 (quoting *Monk v. State*, 532 So.2d 592, 601 (Miss. 1988)).

¶154.  This Court has stated:

This Court, in the recent case of *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), utilized the authority recognized in *Chapman* "to hold offenses to certain of an accused's constitutional rights do not per se require reversal." *Id.* at 135. The Court in *Hansen* stated the reviewing court must first objectively examine the instructions and evidence considered by the jurors in reaching their verdict. The final analysis is whether:

> the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the . . . [rights violation]. . . . *Hansen*, 592 So. 2d at 136) (citations omitted).

*Taylor*, 672 So. 2d at 1267.

¶155.  Keeping in mind that the prosecutor is afforded broad latitude in closing arguments, the ultimate question for this Court to decide is whether the prosecutor's remarks denied Walker a fundamentally fair trial. *Stringer v. State*, 500 So. 2d 928, 939 (Miss. 1986).

"[T]he court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence." *Id.* at 391 (quoting *Gray v. State*, 351 So. 2d 1342, 1346 (Miss. 1977) (quoting *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 131 So. 817, 820 (1930))). "To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (quoting *U.S. v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (quoting *U.S. v. Agurs*, 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976))).

*Manning v. State*, 735 So. 2d 323, 345 (Miss. 1999).

¶156. Said another way,

Even if the comment was improper, the test used to determine if reversal is required is "whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice." *Rushing*, 711 So. 2d at 455 (quoting *Taylor v. State*, 672 So. 2d 1246, 1270 (Miss. 1996) (citing *Craft v. State*, 226 Miss. 426, 434, 84 So. 2d 531, 535 (1956))).

*McGilberry v. State*, 741 So. 2d 894, 911 (Miss. 1999). Accordingly, in considering whether Walker was denied a fundamentally fair trial, "[i]t is imperative that the statements be read in their appropriate context in light of that which the prosecutor was in fact arguing to the jury at the time." *Holland v. State*, 705 So. 2d 307, 347 (Miss. 1997). Furthermore, the prosecutor's statements are "reviewed to see the magnitude of prejudice, the effectiveness of the curative instruction, and the strength of the evidence of the defendant's guilt." *Id.* (citations omitted).

¶157. Even though the prosecution is given broad latitude in criminal cases during closing arguments, "when a jury is properly instructed that statements made by counsel are not evidence, reversal is not required." *Burns*, 729 So. 2d at 229 (citing *Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992)). Here, the jury was instructed by the trial court in Sentencing Phase

Instruction C-1 that, "Arguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence. Any such argument, statement or remark having no basis in the evidence should be disregarded by you."

¶158. Assuming arguendo the prosecutors comments were improper, such error would be harmless beyond a reasonable doubt in light of the instruction by the trial court that such comments did not constitute evidence and should be disregarded.

¶159. Walker assigns error to five comments made by the prosecutor during his closing argument at the sentencing phase: (1) the suggestion that Richardson's murder was torturous; (2) the comparison of Walker's rights to Richardson's rights; (3) the mention of Walker's gang involvement; (4) the mention of Walker's drug use; and (5) the suggestion that the safety of the prison guards could be at issue if Walker received a life sentence instead of death.

### A. Comment Regarding Richardson's Murder Being Torturous.

¶160. The comment was proper because it was supported by the evidence presented at trial. The jury was instructed on the definitions of the words "heinous, atrocious and cruel" in Sentencing Instruction No. C-18, which was properly given.

¶161. There was evidence presented at trial that this killing was torturous and caused extreme pain. It is undisputed that Walker stabbed and slashed Richardson twenty-five times, from the top of his head to the abdominal area and that Richardson did not die immediately.

¶162. We find that there is ample evidence presented to establish that the crime committed by Walker fit squarely within the definition of heinous, atrocious and cruel. We hold that the State's comment that this murder was torturous was not only a proper comment, it was factually true. Thus, it was supported by the evidence presented at trial. Therefore, the prosecutors's

63

closing argument at the sentencing phase describing the murder as "torturous" was a "fair comment on the evidence," *Burns*, 729 So. 2d at 228, and did not deprive Walker of a fundamentally fair trial.

### B. *Comparison of Rights.*

¶163.   During closing arguments at the sentencing phase, the prosecutor stated:

> It's Charles Richardson's day in court, as well.   You are going to hear all this about their begging you for Derrick's life that's in your hands.   Well, what Derrick Walker is asking you folks for is the chance he never Charles Richardson.   I imagine Charles Richardson would have liked to have had a few people there to beg for his life.   I imagine he would have liked to have had somebody there protecting his rights, as has been scrupulously done in this case for Mr. Walker.   Derrick wants what Charles never got that night, a chance to live, and he has had that chance, and now this thing is winding down, it's just about over, and it's time for all of us to do our duty.

¶164.   The prosecutor's comment on the comparison of Richardson's rights to Walker's was an isolated comment on the evidentiary fact that Richardson was no longer alive and that his life was illegally taken by Walker.

¶165.   This Court has in previous cases discussed the propriety of prosecutorial comments similar to the comments make by the prosecutor during the sentencing phase closing arguments. In *Davis*, 684 So. 2d 643, during sentencing phase closing arguments, the prosecutor stated that Davis "was the judge and the defense lawyer . . . .   He was the jury.   And he decided in his own mind to kill and murder . . . .   Mr. Davis had due process." *Id.* at 654.   Davis claimed that the statements constituted an improper comment on his exercise of specific constitutional rights. *Id.*   In *Shell v. State*, 554 So. 2d 887, 900 (Miss. 1989), *rev'd on other grounds*, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990), Shell made the same contention regarding the prosecutor's comment that Shell "was clothed in the full protection of the Constitution of the

United States and he got what [the victim] never got. And that is a jury of twelve good people to decide his fate." In *Wells v. State*, 698 So. 2d 497, 511 (Miss. 1997), during the sentencing phase closing arguments, the prosecutor made the following comments:

> [BY MR. DUNCAN:] Last year, for whatever reason, this Defendant decided that Gary Wells needed to die. He carried it out. He did it brutally, and then buried him in the backyard. For whatever reason, he justified it.
> And, he didn't come and ask twelve people like yourselves if that was okay. He didn't have, Gary Wells didn't have two lawyers to plead his case. Gary Wells didn't have the opportunity to have his family come and plead his case to the Defendant. Gary Wells didn't have the protection of the law.

¶166. In each case, the Court held that since there was no other portion of the closing argument to the same effect, the comments by the State were isolated and did not warrant a reversal. *Wells*, 698 So. 2d at 511; *Davis*, 684 So.2d at 655; *Shell*, 554 So. 2d at 900.

¶167. The language of *Davis* and *Shell* is clearly distinguishable. The language of *Wells* is similar to the issue presented here because neither the words "due process," nor "clothed in the full protection of the Constitution of the United States" were mentioned. It cannot be said that Walker was denied a fundamentally fair trial. Alternatively, assuming arguendo that the comments rise to the level of *Davis* or *Shell*, they are isolated in nature, and since no other portion of the closing argument focused on the rights or even mentioned the exercise of constitutional rights, the comments do not warrant a reversal of the jury's verdict. *See Wells*, 698 So. 2d at 511; *Davis*, 684 So. 2d at 654; *Shell*, 554 So. 2d at 900.

### C. Comment Regarding Drug Use and Being a Member of a Gang.

¶168. Walker argues that the prosecutor improperly commented on his drug use and being a member of a gang because such matters were not in evidence. Conversely, the State contends that the comments were supported by the evidence. In regard to drug use, Walker's witness at

65

the sentencing phase, Dr. Webb, testified on direct examination that part of Walker's diagnosis was that he admitted to abusing marijuana: "he describes abusing and using marijuana to excess for years." In regard to gang involvement, Dr. Webb testified on cross-examination that Walker admitted being a member of a gang: "I did ask him about gangs, and he did describe being in a gang situation in Okolona and some connection of interaction with a gang in Tupelo." Additionally, although she did not per se state that Walker was a member of a gang, Walker's mother, Indiana C. Ezell, testified that Walker "was under the influence of other people."

¶169. During the closing arguments at the sentencing hearing, the prosecutor stated:

> Near as I can tell, the rest of the mitigation consisted of y'all being told the defendant is kind of a ne'er-do-well. He is a gang member. Smokes a ton of marijuana. Been in trouble since his teenage years.

The prosecutor was merely arguing that Walker's background does not relieve him of the responsibility of his actions. The comments were clearly supported by the evidence. Therefore, we hold that the prosecutor's comments were supported by the evidence presented and did not deprive Walker of a fundamentally fair trial.

### D. Comment on the Safety of the Prison Guards.

¶170. Walker next contends that he was denied a fair trial due to the comments of the prosecutor regarding the safety of the prison guards if Walker was to receive a life sentence instead of death. The State counters claiming that the prosecutor made such an argument in the context of its claim that Walker's actions were so atrocious as to suggest that he was disconnected from society. The State argues that Walker had to be truly depraved to stab and slash Richardson twenty-five times. The following dialogue ensued during the sentencing phase:

66

BY MR. JOYNER: The fellow told you, the psychiatrist told you, that Derrick was disconnected from everyone. Well, that's true. Derrick has shown that he is disconnected pretty well. You have to be kind of disconnected from the feelings and emotions of other human beings to take that knife, hide in somebody's house who has done nothing to you, stab them 15 times, plunge the knife into the scalp, into their body repeatedly, taking the knife, slashing him with it. I agree with that to some degree. He has got to be disconnected from the feelings and emotions of other people. But is that a mitigator? Does that mitigate in some way what he did, that he doesn't care who he hurts? Doesn't care what he does to them, doesn't care what he has to do to somebody to get what he wants. Couple credit cards, a dollar, and a car. Does that in some way make this all okay? Does that in some way lessen the punishment that he should receive? Absolutely not. Think of it like this, when you are thinking of the disconnection, if he is given a life sentence rather than the ultimate sanction that is available to you, there is a safety issue of guards and other prisoners to consider.

BY MR. HOUSLEY: Your Honor, I object to this line of argument.

BY MR. JOYNER: Your Honor, the case law clearly says they are allowed to consider such.

BY THE COURT: The objection is overruled.

¶171. It is clear that Walker made a contemporaneous objection at trial regarding the safety of the prison guards. Therefore, Walker reserved his right to have this Court review whether error occurred.

¶172. This Court addressed this issue in *Wells*, 698 So. 2d at 511-12:

Referring to the jury's option of sentencing Wells to life in prison without possibility of parole, the prosecutor stated, "Well, you know, ladies and gentlemen, there are other people in prison, too. You have got prison guards and secretaries and bookkeepers and even other prisoners themselves." After the trial court overruled Wells' objection, the prosecutor continued, "You know, they deserve some protection from somebody like this. Life in prison without parole is not going to protect them one iota." Wells then moved for a mistrial, which motion the trial court overruled. In the case of *Woodward v. State*, 533 So. 2d 418, 433 (Miss. 1988), *cert. denied*, 490 U.S. 1028, 109 S. Ct. 1767, 104 L. Ed. 2d 202 (1989), the prosecutor stated in closing arguments, "You know, as bad as I hate to say it, what about prisoner's rights? What about those people in

Parchman who are in there for drugs?" In our opinion, we engaged in a discussion of recent federal cases that dealt with this type of argument. In *Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir. 1985), *vacated on other grounds*, 478 U.S. 1016, 106 S. Ct. 3325, 92 L. Ed. 2d 732 (1986), where the prosecutor suggested that the defendant might kill a guard or fellow prisoner, the Eleventh Circuit held that the prosecutor's comments were "directly relevant to the consideration of whether [the defendant] would remain a threat to society." In another case, the Eleventh Circuit held that an argument about the safety of prisoners and guards should the defendant be sentenced to life in prison did not call for a speculative inquiry into prison conditions and was an appropriate means of pointing out the possibility of the defendant's future dangerousness. *Tucker v. Kemp*, 762 F.2d 1480, 1486 (11th Cir. [1985]), *vacated on other grounds*, 474 U.S. 1001, 106 S. Ct. 517, 88 L. Ed. 2d 452 (1985). In light of these decisions, we found the assignment of error to be without merit. *Woodward*, 533 So. 2d at 434. Likewise, we hold that the prosecutor's comments in the case sub judice were not improper.

¶173. In light of our decision in *Wells*, we once again hold that the prosecutor's comments were not improper. The record clearly evidences that Walker received a fundamentally fair trial. Consequently, as to the entirety of Issue XI, we find no error occurred in the trial court.

### XII. Passion and Sympathy Instruction.

¶174. Walker claims that the trial court erred in instructing the jury that passion and prejudice have no part in sentencing. According to Walker, the jury was instructed to disregard sympathy in toto. The State argues that Walker did not object to the giving of Sentencing Instruction C-1. However, the State concedes that Walker did object to the giving of Sentencing Instruction C-17, claiming that it was repetitive, unnecessary, and not required.

¶175. Sentencing Instruction C-1 and C-17 were both submitted to the jury as sentencing instructions. Sentencing Instruction No. C-17, which was given, reads in pertinent part:

> You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, *but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling*.

(Emphasis added). Sentencing Instruction C-1 noted a similar charge, stating in pertinent part: "You are to apply the law to the facts and in that way decide the case. You should not be influenced by bias, sympathy or prejudice."

¶176. Walker cites *Pinkney v. State*, 538 So. 2d 329, 351 (Miss. 1988), *vacated and remanded on other grounds*, 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed. 2d 931 (1990), for the proposition that under the Eighth Amendment to the U.S. Constitution, "a jury may not be instructed to disregard, in toto, sympathy" in a capital case.

¶177. In *Flowers v. State*, 842 So. 2d 531 (Miss. 2003), this Court upheld a sentencing instruction, which read in pertinent part:

> You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, *but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling*.

*Id.* at 563 (emphasis added); *see also Jackson v. State*, 860 So. 2d 653, 674-75 (Miss. 2003) (where this Court upheld the trial court's giving of the same instruction). It is evident that the sentencing instruction given in *Flowers* and *Jackson* and sentencing instruction, C-17, are the exact same. C-1 uses nearly the exact language concerning sympathy, although C-1does not include the word "mere" as does C-17. Importantly, neither charge instructed the jury to disregard sympathy and passion in toto. *See generally Blue*, 674 So. 2d at 1225. Neither of these instructions instruct the jury to *totally* disregard sympathy or passion. *See Jackson*, 860 So. 2d at 675. In light of this Court's previous decisions, Walker's assignment of error is without merit.

**XIII. Instructions Given During the Sentencing Phase.**

¶178. Walker claims that several errors were made during the sentencing hearing, such that reversal is warranted. Walker cites *Williams v. State*, 445 So. 2d 798, 811 (Miss. 1984), which states: "[T]he jury's verdict at the sentencing phase is the single most important stage of the process of determining whether the defendant will live or die." However, in *Williams*, this Court also stated that our role is "secondary and subordinate, and our power to review is severely limited as a matter of law." *Id.*

A. *Sympathy and Passion.*

¶179. First, Walker assigns error to Sentencing Instruction C-17, which charged the jury, "not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The propriety of this sympathy charge has been fully discussed in Issue XII, *supra*.

¶180. Walker relies on *King*, 784 So. 2d 884, which states: "'a jury may not be instructed to disregard, *in toto*, sympathy' in a capital case." *Id.* at 889 (quoting *Pinkney*, 538 So. 2d at 351) (emphasis added). Walker further claims that C-17 was repetitive of the court's earlier unnecessary Sentencing Instruction C-1. In *King*, we noted that we upheld an instruction in *Blue*, 674 So. 2d at 1225, which read in pertinent part as follows:

> [Y]ou are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

*King*, 784 So. 2d at 889. This Court went on to hold that, "'[B]ecause the instruction does not inform the jury that it must disregard in toto sympathy . . . the instruction is a proper statement of the law.'" *Id.* (quoting *Blue*, 674 So. 2d at 1225).

70

¶181. In the case sub judice, C-17 mirrored the language of the instruction we upheld in *Blue*. *See also Jackson*, 860 So. 2d at 674-75; *Flowers*, 842 So. 2d at 563. Here, the instructions, C-1 and C-17, did not instruct the jury to *totally* disregard sympathy and passion.

¶182. The giving of C-17 in no way dissuaded Walker's counsel from arguing for Walker's life, which counsel did in a thorough fashion. Walker's counsel argued during closing argument at the sentencing phase that Walker's life had value, and that the jury did not have to oppose the death penalty. Walker's counsel analogized Walker to a "deer in the headlights" of the jury, with the jury having the ability to stop and avoid hitting Walker. The State objected to this line of argument as appealing to the sympathy of the jury. Following the objection, the trial court *overruled the State's objection*, stating that counsel "has wide leeway during final argument." Walker's counsel referred to the religious song, "Amazing Grace," noting that while the jury should punish the defendant, they should have mercy on him as well.

¶183. The language and context of C-1 differs from the language and context of C-17. C-1 instructed the jury to determine the facts from the evidence, apply the law to the facts and decide the case without being influenced by bias, sympathy or prejudice. C-17 instructed the jury to decide whether the defendant will be sentenced to death or life in prison, making such decision based on a weighing of the aggravators and mitigators under a caution "not to be swayed by mere sentiment . . . ." It is evident that C-17 was the only instruction dealing with sympathy in the context of weighing aggravators and mitigators. These instructions focus on two separate issues–the jury's decision on the case itself and the jury decision on the sentence.

¶184. Second, Walker has failed to cite any relevant authority to support his claim that repetitive instructions should not be given, and therefore, is procedurally barred. *See Simmons*,

71

805 So. 2d at 487 (citing **Williams**, 708 So. 2d at 1362-63) (failure to cite any relevant authority obviates our obligation to review such issues).

¶185. Jury instruction, C-1, is certainly not the determinative issue in this case. The use of C-1 by itself could be argued at best to be mere error. However, the jury is required to accept the jury instructions as a whole, and it is evident that the jury was properly instructed. *See* **Walker v. State**, 881 So. 2d 820, 829 (Miss. 2004) (collecting authorities). This amounts to a de minimis error, if one at all. Assuming arguendo, it was erroneous, it is harmless error beyond all reasonable doubt. Additionally, we hold that Walker is procedurally barred for failure to cite any relevant authority to support this claim.

### B. First Aggravator.

¶186. Walker further claims error with the utilization of robbery as an aggravator, which he claims is duplicative. In other words, Walker claims that the trial court used a "doubling"[19] technique.

¶187. The first aggravator reads as follows:

> 1. Whether the capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or flight after committing or attempting to commit, any robbery, rape, arson, or burglary.

¶188. The State again claims that Walker is procedurally barred for failure to cite any relevant authority. However, notwithstanding this procedural bar, Walker's issue is without merit because this Court has repeatedly held that evidence of the underlying crime can properly be

---

[19] "Doubling" is refers to situations where a crime such as robbery is used both as the underlying felony to support a capital murder charge and as an aggravating circumstance to support the imposition of a death sentence.

used to both elevate the crime to capital murder and, later, as an aggravating factor. *See Goodin*, 787 So. 2d at 654-55; *Smith*, 729 So. 2d at 1223; *Davis*, 684 So. 2d at 663-64.

¶189. Walker also claims that the court erred because the aggravator included reference to rape, which was not a possibility in this case. This is a spurious claim since the aggravator was copied from Miss. Code Ann. § 99-19-101(5)(d) (2000), which includes rape as one felony on a list of underlying felonies. During the objections to instructions, the trial court noted that rape was not an issue in this case, and the State agreed, noting that it simply copied the aggravating instruction from the statute.

¶190. This Court has "'consistently held that instructions in a criminal case which follow the language of a pertinent statute are sufficient.'" *Byrom v. State*, 863 So. 2d 836, 880 (Miss. 2003) (quoting *Crenshaw v. State*, 520 So. 2d 131, 134 (Miss. 1988)). Moreover, in *Woodward*, 726 So. 2d at 539-40, this Court stated:

> The United States Supreme Court has held that there is no constitutional violation where "a trial court instructed a jury on two different legal theories, one supported by the evidence, the other not." *Sochor v. Florida*, 504 U.S. 527, 538, 112 S. Ct. 2114, 2122, 119 L. Ed. 2d 326 (1992) (citing *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991)). The high Court "reasoned that although a jury is unlikely to disregard a theory flawed in law, it is indeed likely to disregard an option simply unsupported by the evidence." *Sochor*, 504 U.S. at 538, 112 S. Ct. at 2122.

¶191. Walker was indicted and convicted of capital murder, with robbery being the underlying felony committed. The State did not try to mislead the jury into believing that Walker was guilty of any underlying felony other than robbery. There was no evidence presented to even suggest that Walker was guilty of the crime of rape. This part of the instruction was not confusing, and therefore, ultimately proper.

73

### C. Second Aggravator.

¶192. Walker further claims that the court erred in giving the second aggravator, which stated:

> 2. Whether the capital offense was committed for the purpose of avoiding or preventing lawful arrest or effecting an escape from custody.

¶193. Since the jury did not find this aggravator, this is a moot issue. Moreover, Walker has not shown that he has suffered prejudice from the giving of the instruction, and thus, any error that may have occurred is harmless beyond a reasonable doubt. *See generally* **Randolph**, 852 So. 2d at 566; **Mack**, 650 So. 2d at 1310.

### D. Third Aggravator.

¶194. Walker claims that the trial court erred in giving the third aggravator offered, which stated:

> 3. Whether the capital offense was especially heinous, atrocious or cruel.

¶195. In support of his claim, Walker argues in his brief that the murder was nothing more than a stabbing in the commission of a robbery, with "no lingering suffering, no lingering pain, no mutilation, no dismemberment, and no severing." In his brief, Walker states:

> There was no evidence before the jury to suggest any "additional acts" to set the crime apart from the norm of capital felonies as conscienceless, pitiless or unnecessarily torturous. This aggravating circumstance was improperly submitted to the jury.

Furthermore, Walker claims that there is "absolutely no proof whatsoever that Walker intended to torture." Walker, during oral argument before this Court, argued that, "There was nothing out of the ordinary in this killing." This issue has been fully discussed in Issue XI, subsection A, *supra*. For the sake of conciseness, we will not again discuss this issue because to do so would be repetitive. Suffice is to say, Walker stabbed and/or slashed Richardson twenty-five times

74

in his head, neck, face, temple, ear, nose, cheeks, arms, chest, scalp, hand, abdomen, back, chin and lip. Richardson attempted to ward off the attack, but Walker kept on stabbing and slashing. Walker then waited for Richardson to bleed to death before taking Richardson's personal belongings, and setting Richardson's house afire. There was testimony that Richardson's murder was torturous and that Richardson suffered excessive pain.

¶196. We hold that there was an abundance of evidence to support the giving of the "heinous, atrocious or cruel" aggravator. Moreover, Walker has cited no relevant authority requiring Walker to have "intended" to torture Richardson in order for the murder to be, in fact torturous. As such, this issue fails. *See Simmons*, 805 So. 2d at 487 (citing *Williams*, 708 So. 2d at 1362-63) (failure to cite any relevant authority obviates our obligation to review such issues).

E. *Proposed Sentencing Phase Instructions DS-1 and DS-2.*

¶197. Walker argues that the trial court erred in refusing instructions DS-1 and DS-2, which Walker alleges accurately state the law.

1. *Proposed Instruction DS-1.*

¶198. Proposed Sentencing Phase Instruction DS-1 read as follows:

> The fact that Derrick Demond Walker has been convicted of capital murder is not in itself an aggravating circumstance and may not be considered by you when deciding to impose a death sentence. The fact of conviction of capital murder does not justify imposition of the death sentence.

¶199. The aggravating circumstances are listed in C-17, which instructs the jury to "[c]onsider *only the following elements of aggravation in determining whether the death penalty should be imposed*." (Emphasis added). Walker's conviction for capital murder is not listed as being one of the *only aggravators* the jury was instructed to consider in deciding whether the death

penalty should be imposed. Consequently, the jury was properly instructed that the murder itself was not an aggravator, and as such, there was no requirement to separately instruct the jury. Jury instructions are to read as a whole. *Thomas*, 818 So. 2d at 349. DS-1 was cumulative as the jury was already properly instructed on the aggravating factors it could consider. It is not error to refuse a repetitious instruction. *Edwards*, 737 So. 2d at 317; *Walker*, 671 So.2d at 613; *Griffin*, 494 So.2d 376, 381 (Miss. 1986).

¶200. Additionally, the use of the word "justify" is confusing and inappropriate. Had it not been cumulative, it would have been error to submit this instruction to the jury, if "justify" was utilized, as opposed to "compel," "obligate," "require" or similar words.

*2. Proposed Instruction DS-2.*

¶201. Proposed Sentencing Phase Instruction DS-2 read as follows:

> You are instructed that you need not find any mitigating circumstances in order to return a sentence of life imprisonment without the possibility of parole or early release. Moreover, even if you find that the mitigating circumstances do not outweigh one or more of the aggravating circumstances, you can impose a life sentence without the possibility of parole or early release.

¶202. This Court has previously rejected the same instruction. In *Edwards*, this Court reviewed a verbatim instruction proposed by the defendant. 737 So. 2d at 317. Finding that the proposed instruction was a "mercy" instruction, this Court rejected Edwards' claim that he was entitled to such instruction. *Id.* Following our prior ruling in *Edwards*, we find the exact same instruction Walker proposed here to be a "mercy instruction," which he is not allowed. *See Doss v. State*, 709 So. 2d 369, 394 (Miss. 1996) (quoting *Ladner v. State*, 584 So. 2d 743, 761 (Miss. 1991)) ("This Court has explicitly held that a 'defendant has no right to a mercy instruction.'"). Therefore, the instruction was properly refused.

76

¶203. In each of the subsections listed in this issue, we find that there is no error. A review of the given sentencing instructions, reveals that the jury was properly instructed. Therefore, Walker's assignment of error is without merit.

### XIV. Cumulative Error.

¶204. In his final assignment of error, Walker claims that the aggregate effect of the variety of claimed errors require reversal. Walker cites *Weeks v. State*, 804 So. 2d 980 (Miss. 2001), as authority for this proposition when this Court held that, "individual errors, not reversible in themselves, may combine with other errors to make up reversible error." *Id.* at 998 (quoting *Wilburn v. State*, 608 So. 2d 702, 705 (Miss. 1992)).

¶205. The State counters with a quote from *Simmons*, which reads:

> "[w]here there is no reversible error in any part, .... there is no reversible error to the whole." *Doss v. State*, 709 So. 2d 369, 401 (Miss. 1996). Additionally, this Court has held that a murder conviction or a death sentence will not warrant reversal where the cumulative effect of alleged errors, if any, was procedurally barred. Doss, 709 So. 2d at 401. Cumulatively, these errors do not warrant reversal.

805 So. 2d at 508. The question under all cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial. *Conner v. State*, 632 So. 2d 1239, 1278 (Miss. 1993).

¶206. Many of Walker's assigned errors are subject to procedural bars or alternatively without merit. That being said, for the reasons stated herein, we find that any de minimis error which may appear in the case sub judice, is individually harmless beyond all reasonable doubt, and when taken cumulatively, the effect of all error, if any, committed during the trial did not deprive Walker of a fundamentally fair and impartial trial. "A criminal defendant is not entitled

77

to a perfect trial, only a fair trial." ***McGilberry***, 741 So. 2d at 924 (citing ***Sand v. State***, 467 So. 2d 907, 911 (Miss. 1985)). Consequently, this issue is devoid of merit.

### XV. Proportionality Review.

¶207. Miss. Code Ann. § 99-19-105(3) (2000) requires this Court to conduct certain specific inquiries in addition to the assignment of errors by the appellant. As § 99-19-105(3) states, we are required to determine:

> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

> (b) Whether the evidence supports the jury's or judge's findings of a statutory aggravating circumstance as enumerated in Section 99-19-101;

> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

> (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶208. Ever since ***Jackson v. State***, 337 So. 2d 1242 (Miss. 1976), this Court has upheld the imposition of the death penalty in the cases listed in the attached Appendix. After carefully reviewing other similar cases listed in the appendix and comparing them with Walker's case, we find that the conviction and sentence are appropriate. Furthermore, in specifically fulfilling this Court's statutory requirements of § 99-19-105(3), we find that the sentence of death by lethal injection in this case was not imposed under the influence of passion, prejudice or any other arbitrary factor; that the evidence supports the jury's and judge's findings of the statutory aggravating circumstances as enumerated in § 99-19-101; and after considering the heinous

nature of the crime, the sentence of death by lethal injection is not excessive or disproportionate to other cases in which the same sentence has been imposed.

## CONCLUSION

¶209. Walker has failed to present a single reversible error, any plain errors, or a cumulation of errors to disturb his conviction and sentence. Walker's conviction and sentence were properly decided by the jury. Additionally, the § 99-19-105(3) inquiry fails to illuminate any error either. This Court has never held that a criminal defendant is entitled to a prefect trial, even with our "heightened scrutiny" standard of review in death penalty cases. A perfect trial is simply impossible. A criminal defendant is entitled, however, to a constitutionally fair trial under the Mississippi and United States Constitutions. We are satisfied that Derrick Demond Walker did receive a constitutionally fair trial.

¶210. Accordingly, for the foregoing reasons, we affirm the judgment of the Lee County Circuit Court.

¶211. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED. COUNT II: CONVICTION OF ARSON OF A DWELLING HOUSE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY WITH THE SENTENCE IN COUNT I.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND DICKINSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So.2d 20 (Miss. 2004)

*Branch v. State,* 882 So.2d 36 (Miss. 2004).

*Scott v. State,* 878 So.2d 933 (Miss. 2004).

*Lynch v. State,* 877 So.2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So.2d 140 (Miss. 2004).

*Byrom v. State,* 863 So.2d 836 (Miss. 2003).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*,  800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,*  787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)**.**

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).        *remanded for *Batson* hearing.


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)


*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)


*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

\*****Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

\*****Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

\*****Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

\*****Jones v. State***, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

**DEATH CASES AFFIRMED BY THIS COURT**

**(continued)**

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

    *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

## (continued)

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT


*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

   *****Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State,* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

   **Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

   *****Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

   *****Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

## DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## ON SENTENCING PHASE ONLY
### (continued)

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied, Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 F. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.